**Barry I. FREDERICKS, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 96–7748.

United States Court of Appeals, Third Circuit.

Sept. 11, 1997.

Barry I. Fredericks (argued), Englewood Cliffs, NJ, for appellant.

Loretta C. Argrett, Assistant Attorney General, Kenneth L. Greene, Karen D. Utiger (argued), Tax Division, Department of Justice, Washington, DC, for appellee.

Before: STAPLETON, LEWIS and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

We must decide whether this is an appropriate case to apply the doctrine of estoppel against the Internal Revenue Service (IRS). Barry I. Fredericks appeals a decision of the United States Tax Court that approved a deficiency assessed by the Commissioner of Internal Revenue in July 1992 for Fredericks' 1977 income tax return. The IRS action requires the taxpayer to pay an additional tax of $28,361 and approximately $158,000 in interest on the basis of a disallowed tax-shelter deduction. The taxpayer filed a timely 1977 tax return, but the IRS took 14 years to decide if the tax-shelter deduction taken by the taxpayer was appropriate.

The IRS' assessment was filed long after the three-year statute of limitations had expired. However, at the request of the IRS Fredericks signed various consent agreements extending the time for the government to assess his 1977 tax return. The taxpayer's estoppel contention is based on alleged misrepresentations and misconduct by the IRS regarding its possession, solicitation and use of these consent forms. The appeal requires us to determine whether the IRS was estopped from making the assessment in 1992 because of its conduct regarding these consent agreements.

The taxpayer alleges the IRS committed the following misconduct in connection with the forms he and the IRS executed to extend the statute of limitations. First, the IRS misrepresented in 1981 that it never received a Form 872–A (Special Consent to Extend the Time to Assess Taxes), which Fredericks had signed to authorize an indefinite extension of the statute of limitations. Second, the IRS confirmed this misrepresentation in 1981, 1982 and 1983, by soliciting and executing three separate Forms 872, which extend the statute of limitations for one year. Third, the IRS discovered that it possessed the Form 872–A sometime before June 30, 1984, the date the last one-year extension expired, decided to rely on that form in continuing its investigation of Fredericks' tax return and failed to notify the taxpayer of its changed course of action. Fourth, the IRS used the Form 872–A to assess a deficiency in 1992, 11 years after informing the taxpayer that the Form 872–A did not exist, and eight years after the final one-year extension expired. Finally, the IRS imposed interest penalties totaling over five times the amount of the tax and covering the entire duration of its protracted investigation of the tax shelter.

The IRS rejected the taxpayer's statute-of-limitations defense, which was based on the third Form 872 executed by Fredericks and the government. The Commissioner argued that the Form 872–A remained in effect, even though the IRS had represented for the previous 11 years that no such form existed. The taxpayer contended that he relied on the IRS' affirmative misrepresentations over the years to his detriment and, thus, the Commissioner is estopped from using that Form 872–A.

We conclude that this taxpayer has met his burden of proving the traditional elements of equitable estoppel, and has mounted the high hurdle of establishing other special factors applicable to estoppel claims against the government. Accordingly, we will reverse the

Tax Court's decision approving the assessment.

The Tax Court had jurisdiction pursuant to 26 U.S.C. §§ 6213(a), 6214 and 7442. We have jurisdiction under 26 U.S.C. § 7482(a)(1). The appeal was timely filed in accordance with Rule 13(a), Federal Rules of Appellate Procedure.

 Tax Court decisions are reviewed in the same manner as district court decisions in non-jury civil cases. 26 U.S.C. § 7482(a); *Bachner v. Commissioner*, 81 F.3d 1274, 1277 (3d Cir.1996). Determinations that a party failed to establish its burden of proof are reviewed under the clearly erroneous standard. In *Re Brown*, 82 F.3d 801, 804 (8th Cir.1996); *Knop v. McMahan*, 872 F.2d 1132, 1140 (3d Cir.1989). We also review findings of fact for clear error, and we apply plenary review to the Tax Court's conclusions of law. *United States v. Asmar*, 827 F.2d 907, 913 n. 8 (3d Cir.1987).

## I.

In 1978, Fredericks and his former wife filed a timely joint federal income tax return for 1977. In October 1980, the IRS sent Fredericks a Form 872–A, Special Consent to Extend the Time to Assess Taxes, requesting him to extend for the 1977 tax year the three-year statute of limitations within which the government must assess deficiencies. J.A. 22a. *See* 26 U.S.C. § 6501(a). On October 17, 1980, Fredericks signed and returned the Form 872–A, authorizing the government to assess deficiencies within 90 days of:

(a) the IRS' receipt of a Form 872–T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, from the taxpayer; or

(b) the IRS' mailing of a Form 872–T to the taxpayer; or

(c) the IRS' mailing of a notice of deficiency for the relevant year.

None of these events occurred. According to the government's "received" date stamp on the Form 872–A, it was received by the Audit Division of the Manhattan District Director's Office on November 3, 1980, and signed and dated by the IRS on November 4, 1980.

In January 1981, an IRS agent telephoned Fredericks and requested him to sign a Form 872, Consent to Extend the Time to Assess Tax, for the 1977 tax year. According to Fredericks' trial testimony:

[The] IRS agent ... indicated that he was reviewing my tax return involved in the audit of my 1977 tax return, and ... the statute of limitations was about to run and that the Government needed an extension of that statute.... I told the ... agent that I had already executed and returned ... an extension.... He told me he was in charge; he had my file and there was no extension in the file. He asked me did I receive ... a copy of the extension back from the IRS signed. I said I did not. He indicated ... that therefore the Government did not have it, it was probably lost in the mail, and that he needed me to execute another extension, otherwise the Government was going to assess the tax. But they didn't want to do that. They wanted time to review, and would I send them an 87—a new form. We did not mention numbers.

J.A. 81a–82a. The IRS did not contradict this testimony.

Consistent with Fredericks' testimony, the government sent a Form 872, which he signed and returned to the IRS. The Form 872 expressly extends the statute of limitations for only one year, whereas the Form 872–A authorizes an indefinite, although revocable, extension of the statute of limitations. The first Form 872 executed by the IRS and Fredericks extended the statute of limitations until December 31, 1982.

The agents telephoned Fredericks on two additional occasions and requested him to sign and return two additional Forms 872. On June 13, 1982, Fredericks signed and returned a consent to extend the statute of limitations to December 31, 1983; and on February 3, 1983, Fredericks signed and returned a Form 872 agreeing to extend the statute of limitations until June 30, 1984. Each of these Forms 872 was received and signed by an agent of the IRS Newark District Director's Office, and copies of these

signed forms were subsequently forwarded to, and received by, Fredericks.

Throughout oral argument, counsel for the IRS made abundantly clear why the government requested these extensions of the statute of limitations:

IRS COUNSEL: What really took so long in this case was the fact that it took a very long time for the IRS and the tax shelter which the IRS was investigating in which Mr. Fredericks had invested, to reach an agreement .... [A] number of years went by, .... I believe that a couple of organizations were involved. It was a complicated settlement.

\* \* \* \* \* \*

IRS COUNSEL: [I]t's very common when you have complicated tax shelters like this to ask for very long ... extensions.

THE COURT: But you didn't ask for any additional extensions after the ... expiration in 1984 did you?

IRS COUNSEL: No, we did not ....

Counsel for the IRS also made clear that the consent agreements extending the statute of limitations were repeatedly obtained for both the IRS' and the taxpayers' benefit:

IRS COUNSEL: Mr. Fredericks didn't want that tax assessed any more than the IRS agent did. And why was that? Because they were still in negotiation on the underlying tax shelter which was not resolved until 1988. That's why he didn't want the tax assessed and that's why the IRS agent didn't want the tax assessed ....

After February 1983, the IRS made no attempt to extend the statute of limitations, which pursuant to the third Form 872 expired on June 30, 1984. In light of the IRS' representations that it neither signed nor possessed a Form 872–A indefinite extension of the statute of limitations, the taxpayer concluded that the government lacked authority to assess a deficiency on his 1977 income tax return after that date.

On July 9, 1992—eight years and nine days after the June 30, 1984 expiration date—the IRS mailed a notice of deficiency to Fredericks and his former wife alleging they were liable for $28,361 in income tax, plus interest for the 1977 tax year. Fredericks filed a petition in the Tax Court challenging the deficiency assessment on grounds that it was barred by the June 30, 1984 statute of limitations agreed to in the third Form 872. Thus, Fredericks claimed the Commissioner was estopped from relying on the Form 872–A to avoid the statute-of-limitations defense, which completely bars the assessment of any deficiency.[1]

The Tax Court held a trial at which Fredericks testified and the Commissioner presented no witnesses. Significantly, the IRS presented no evidence as to the date it "discovered" its possession of the Form 872–A which it invoked to assess Fredericks' 1977 return in 1992. This is the same form the IRS affirmatively represented to the taxpayer as non-existent. Moreover, the IRS does not dispute that it waited until 1992 to notify the taxpayer that it had the Form 872–A and intended to rely on that form instead of the third Form 872 signed by the parties. At oral argument, counsel for the IRS stated that she did not know when the IRS discovered the Form 872–A or when it decided to rely on that form.

The Tax Court concluded that the government's action did not constitute an affirmative misrepresentation about any fact concerning the Form 872–A, and that Fredericks failed to prove the elements of estoppel. The court found that Fredericks did not establish that he relied to his detriment on the government's acts regarding the Forms 872 (one-year extensions) because he could have at any time filed a Form 872–T to terminate the previously executed Form 872–A (unlimited extension). The court decided that a deficiency of $28,361 was due. Fredericks now appeals that decision.

## II.

The question is whether Fredericks sufficiently established the elements of an estop-

---

1. Petitioner's former wife did not join in the filing of the petition and is not a party in this case.

**438**

pel claim against the government such that it should be prevented from relying on the Form 872–A indefinite extension of the statute of limitations to pursue an otherwise time-barred assessment on Fredericks' 1977 tax return. Fredericks contends the government's July 9, 1992 assessment on his 1977 tax return was barred as of June 30, 1984, the date on which his and the IRS' agreement to extend the statute of limitations expired pursuant to the third Form 872 sought by the government. The Commissioner contends the Tax Court correctly concluded that estoppel is inappropriate here because Fredericks failed to demonstrate that the government's conduct constituted affirmative misconduct.

■ "Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Community Health Servs. of Crawford County, Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984). Parties attempting to estop another private party must establish that they relied to their detriment on their adversary's misrepresentation and that such reliance was reasonable because they neither knew nor should have known the adversary's conduct was misleading. *Id.; U.S. v. Asmar,* 827 F.2d 907, 912 (3d Cir.1987). The Tax Court has set forth the essential elements of estoppel:

1) a false representation or wrongful misleading silence; 2) an error in a statement of fact and not in an opinion or statement of law; 3) person claiming the benefits of estoppel must be ignorant of the true facts; and 4) person claiming estoppel must be adversely affected by the acts or statements of the person against whom estoppel is claimed.

*Estate of Emerson v. Commissioner,* 67 T.C. 612, 617–618, 1977 WL 3636 (1977).

■ This court is among the majority of circuits recognizing estoppel as an equitable defense against government claims, but in such a context we impose an additional burden on claimants to establish some "affirmative misconduct on the part of the government officials." *Asmar,* 827 F.2d at 911 n. 4, 912; *see also Kurz v. Philadelphia Elec. Co.,*

96 F.3d 1544 (3d Cir.1996). The additional element reflects the need to balance both the public interest in ensuring government can enforce the law without fearing estoppel and citizens' interests "in some minimum standard of decency, honor, and reliability in their relations with their Government." *Asmar,* 827 F.2d at 912 (citing *Community Health Servs. of Crawford County v. Califano,* 698 F.2d 615 (3d Cir.1983), *rev'd on other grounds sub nom. Heckler v. Community Health Servs. of Crawford County,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)). *See also United States v. St. John's Gen. Hosp.,* 875 F.2d 1064, 1069 (3d Cir.1989).

In *Heckler v. Community Health Servs. of Crawford County,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984),[2] the Supreme Court reversed this court's holdings on the reliance and detriment elements, but left undisturbed our analysis and conclusions regarding the existence of affirmative misconduct. In finding affirmative misconduct, we stated:

Not every form of official misinformation will be considered sufficient to estop the government.... Yet some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement.

*Califano,* 698 F.2d at 622 (quoting *Brandt v. Hickel,* 427 F.2d 53, 56–57 (9th Cir.1970) (estoppel appropriate even though government's advice that contractor could resubmit bid without losing priority was erroneous and unauthorized)). We found that affirmative misconduct existed because the government "induced" the health care provider, "by the affirmative instructions of the [government agent]" to submit the cost reports without offsetting the grants at issue. "Not once, but on five separate occasions spanning over two years," the government advised the provider not to offset the grants. *Id.* 698 F.2d at 622.

In *Crawford County,* the Supreme Court did not reach the question whether the gov-

2. Hereinafter, we refer to the Third Circuit Court of Appeals opinion in this case as *Califano,* and to the Supreme Court's opinion as *Crawford County.*

ernment's conduct constituted "affirmative misconduct" because the Court concluded the petitioner failed to establish the minimum requirements for estoppel against a private party. *Crawford County*, 467 U.S. at 61, 104 S.Ct. at 2224–25. The Court noted that those who deal with government are expected to know the law and may not rely on the conduct of government agents contrary to law. Thus, reliance on the government's representations in that case was unreasonable. The Court further undermined the alleged reliance in *Crawford County* because the provider received only oral advice, unconfirmed or evidenced by a written instrument. *Id.* at 65, 104 S.Ct. at 2226–27. *See also Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *United States v. St. John's Gen. Hosp.*, 875 F.2d 1064, 1070 (3d Cir.1989) (never reaching affirmative-misconduct issue where there was no written evidence of any misrepresentation and where the government submitted contrary written evidence of the absence of any misrepresentations).

On the detriment element, the Court in *Crawford County* found that the petitioner's alleged detriment was the inability to retain public funds to which it was never entitled. The health services provider suffered no detriment because it had not lost any vested or contingent legal right, or suffered any adverse change in its status. The Court concluded that the petitioner "merely was induced to do something which could be corrected at a later time." *Crawford County*, 467 U.S. at 62, 104 S.Ct. at 2225.

As the foregoing cases instruct, we must determine whether Fredericks sufficiently met his burden of establishing the traditional elements of estoppel. This requires us to consider the elements of misrepresentation, reliance and detriment. We will discuss the affirmative-misconduct element in conjunction with our consideration of the IRS' misrepresentations, and then proceed to the reliance and detriment elements. Subsequently, we will address the special factors that must be present in an estoppel claim against the government.

## III.

### MISREPRESENTATIONS

Fredericks argues that the oral representations the IRS made to him that the Form 872–A indefinite extension was lost in the mail, coupled with its three successful attempts to obtain Form 872 limited extensions of the statute of limitations, misrepresented the fact that the IRS had in its possession the Form 872–A. He contends the government affirmatively maintained that misrepresentation for over 11 years, even after it found and decided to rely on the Form 872–A. Thus, Fredericks argues the government's misrepresentations and his detrimental reliance thereon should estop the IRS from invoking the Form 872–A in 1992 and from denying the effectiveness of the third Form 872, which extended the statute only to June 30, 1984. He contends estoppel is appropriate in this case because the government failed to correct its misrepresentations when it finally learned the Form 872–A was on file and decided to rely on that form.

The government argues that any purported misrepresentations were the result of a lack of communication between its district offices. It claims that the Newark office that obtained Fredericks' three Form 872 limited extensions of the statute of limitations was unaware of the Manhattan office's possession of his previously executed Form 872–A indefinite extension. Such conduct, the government contends, does not constitute the "affirmative misconduct" required to equitably estop the IRS from now relying on the Form 872–A. The government also argues that its reliance on the Form 872–A is valid because, as the Tax Court correctly concluded, that form may be terminated only in the manner set forth in the form; and neither Fredericks nor the IRS filed the requisite 872–T termination form.

The Tax Court's findings on the traditional elements of estoppel focussed on the absence of Fredericks' reliance on the government's acts. The court emphasized that he could have terminated the Form 872–A indefinite extension by filing a Form 872–T at any time. The court concentrated on Fredericks' conduct, rather than on that of the govern-

ment, and in so doing committed reversible error. Beyond the statement of facts in its opinion, the court appears to have ignored the undisputed evidence that the IRS misrepresented to Fredericks that the Form 872–A was not on file and "probably lost in the mail." The IRS' request for three short-term extensions of the statute of limitations reinforced this misrepresentation and induced Fredericks to rely on the agreed-upon termination dates in those Forms 872. The Tax Court defied logic by suggesting that a taxpayer should file a form to terminate a document that according to the IRS does not exist. Such a rule would require taxpayers to venture into an Alice in Wonderland of hypotheticals with the IRS. We reject in toto the Tax Court's reasoning and we decline to adopt a concept that suggests taxpayers should file Forms 872–T to terminate forms which the IRS insists do not exist.

We believe that the misrepresentations here were more egregious than those in *Community Health Servs. of Crawford County v. Califano*, 698 F.2d 615 (3d Cir. 1983), and that they rise to affirmative misconduct. At least in *Califano*, the government immediately notified the health provider upon realizing the erroneous nature of its prior representations. *See also United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir.1992) (finding no estoppel where government's representations were at most ambiguous and where further explanation was immediately sent upon discovery that an earlier representation was erroneous).

Here, the IRS did not refute evidence that it told Fredericks the Form 872–A "was probably lost in the mail." On three occasions over a period of two years the IRS induced Fredericks to sign Forms 872, establishing an agreement to three consecutive specific dates on which the statute of limitations would expire. The government's misrepresentation went beyond mere erroneous oral advice from an IRS agent; it consisted of affirmative, authorized acts inducing Fredericks to sign and rely on the terms of the Form 872 on three different occasions in three different years. Moreover, the IRS' misleading silence after finding and deciding to rely on the Form 872–A, coupled with its

failure to notify Fredericks of its decision and its effective revocation of the third Form 872, constitute affirmative misconduct.

Case law in this and other jurisdictions supports our conclusion. We have recognized that the authority to act, as well as the failure to do so when such authority exists, can give rise to an estoppel claim. In *Ritter v. United States*, 28 F.2d 265 (3d Cir.1928), we stated: "The acts *or omissions* of the officers of the government, if they be authorized to bind the United States in a particular transaction, will work estoppel against the government. . . ." *Id.* 28 F.2d at 267 (emphasis added).

In *Dana Corp. v. United States*, 200 Ct.Cl. 200, 470 F.2d 1032 (1972), the court held that the Post Office Department was estopped from denying the effects of its agent's decision to continue to pay, *and not inform*, the plaintiff-supplier that it was performing in excess of contract requirements. Important to the court's holding were that: 1) the agent knew the supplier was performing in excess of the contract; 2) the continued payments could have induced and encouraged the plaintiff to continue to make shipments not in conformity with the contract; 3) "it is possible that, if plaintiff had been informed of the problem, it could have packaged the [goods accordingly and] maintained an action . . . for additional costs"; and 4) the agent making the contract payments had authority to act and her "decision to continue payment without informing plaintiff of the problem was within the scope of her authority." The court remanded the case for further findings on the issue of detrimental reliance.

In the case at bar, the agent who misrepresented that the IRS did not have a Form 872–A, and the agents who solicited and executed the subsequent Form 872 one-year extensions had authority to act as they did. As in *Dana Corp.*, because of the government's silence after its discovery of, and decision to rely on, the Form 872–A, the IRS agents induced Fredericks to continue to rely on the Forms 872. Had the taxpayer been informed of the IRS' discovery and its decision to adopt an alternative plan of action, he could have—and testified that he would

have—exercised his right to terminate the Form 872–A.

When the IRS discovered its mistake in denying the existence of a previously executed Form 872–A, any number of agents presumably had authority to alert Fredericks to the prior misrepresentation that the form did not exist. We assume that these agents were also authorized to inform Fredericks that the IRS decided to disregard the third Form 872—which extended the statute until June 30, 1984—and decided to rely on this alternative form, which created an indefinite extension period. Instead, the IRS waited eight years before notifying Fredericks that it possessed the form, then filed an assessment and precluded him from exercising his right to terminate the Form 872–A. The IRS should be bound by the authorized acts and omissions of its agents and estopped from relying on the Form 872–A, and from denying the validity of the last Form 872 it executed with the taxpayer. *See, e.g., United States v. Brown*, 86 F.2d 798, 799 (6th Cir. 1936) (after exercising choice to pursue one of two available remedies and letting alternative theory "slumber in the files," IRS is bound by that choice and cannot later pursue the inconsistent alternative remedy).

The IRS' conduct in this case is more unconscionable than that in *Dana Corp.* and similar case law. *See e.g., Stockstrom v. Commissioner*, 190 F.2d 283 (D.C.Cir.1951) (holding IRS estopped from assessing taxpayer for failure to file return where the omission was induced by a ruling of the Commissioner). Here, the IRS claims authority to assess a tax in 1992 based on Fredericks' failure to terminate a Form 872–A when it was the IRS' acts and omissions that lulled Fredericks into inaction. The IRS prevented Fredericks from terminating the Form 872–A by misrepresenting that it did not possess such a form, by affirmatively maintaining that misrepresentation and by failing for eight years to notify the taxpayer after discovering its error and adopting an alternative course of action.

In response to the question raised at oral argument whether the IRS had any obligation to notify the taxpayer when it discovered its possession of the Form 872–A, counsel for the IRS responded:

> I think that as a matter of fairness, and not as a matter of what is statutorily required in this case, that if there was someone at the IRS who realized that Mr. Fredericks had been misled, I do believe that they had an obligation to notify him. That is a different question than the question that we should be asking, which is: is it the proper case to apply equitable estoppel.

We disagree. We reject the notion that IRS agents examining Fredericks' file sometime in 1984 could have discovered a Form 872–A that was signed in 1980 and not known that the taxpayer had been misled·as to its existence given that the three subsequently executed Forms 872 were also in Fredericks' file. It is exactly this combination of written agreements entered into by the IRS and Fredericks that prompted the IRS to forego soliciting additional one-year extensions.

The IRS was the only party with knowledge of all the facts in this case. The IRS' secreting of the reappearance of the Form 872–A, its failure to inform Fredericks of the form's reappearance, its decision to revoke without notice the third Form 872 agreement which limited the extension to June 30, 1984, and its filing of an assessment eight years later constitutes affirmative misconduct and gives rise to the most impressive case for estoppel against the IRS that our research has disclosed. *See, e.g., Vestal v. Commissioner*, 152 F.2d 132, 135 (D.C.Cir.1945) (IRS estopped from characterizing and taxing transaction as one involving a corporation where IRS agent previously deemed and taxed the transaction as one involving a partnership); *Smale & Robinson, Inc. v. United States*, 123 F.Supp. 457 (S.D.Cal.1954) (IRS estopped from raising statute-of-limitations defense to taxpayer's claim where authorized agent "proposed and affirmatively represented, by words and figures placed in [a] report," that an unused credit from earlier tax year would be allowed without the plaintiff's having to make a formal claim. "The authorized act of entering the unused credit and the dollar amount on the report sheet, the reliance of plaintiff thereon, and the subse-

quent lapse of time to plaintiff's prejudice, should bind the Commissioner.")

The Commissioner may not challenge the only permissible inference that can be drawn: that the IRS discovered the presence of the executed Form 872–A prior to the expiration of the third Form 872 extension on June 30, 1984. The precise date is information within the sole possession of the IRS. As previously stated, the Commissioner's counsel confessed at oral argument that she could not supply this information to the court, and that her file did not disclose this information. Nor did the Commissioner see fit to introduce any direct evidence on this issue at the Tax Court trial. We are thus left with circumstantial evidence, but the evidence here has a quality of probability that gives rise to what the logicians describe as a compellable inference. Cf. Tose v. First Pa. Bank, 648 F.2d 879, 895 (3d Cir.1981); Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 116 (3d. Cir.1980). See generally Irving M. Copi & Carl Cohen, Introduction to Logic 58–61 (9th ed. 1994) (discussing the relationship between inferences and probability). Consider the following uncontroverted evidence: (1) the IRS' misrepresentation that it did not have the Form 872–A; (2) the IRS' three requests for, and execution of, annual extensions of the statute of limitations; (3) the absence of any requests for annual extensions after June 30, 1984; (4) the IRS' eight-year delay and production of the Form 872–A in 1992; and (5) the IRS' admission that the investigation of the tax shelter was actively ongoing until 1992. The only reasonable conclusion that can be drawn from the evidence is that the IRS had actual knowledge of the Form 872–A's existence at least prior to June 30, 1984. Otherwise, the government would have sought additional annual extensions because, as stated at oral argument, the investigation was ongoing.

The IRS confirmed its earlier misrepresentations by failing to notify the taxpayer that it possessed the Form 872–A and that the Commissioner intended to rely upon that form. The government's misleading silence was a perpetuation of its misrepresentation that the Form 872–A was never signed or received by the IRS. It was an affirmative decision to usurp the Form 872 agreement entered by the IRS setting June 30, 1984 as the expiration of the statute of limitations. The IRS' decision to lie doggo, and induce the taxpayer into thinking all was well, coupled with its additional eight-year delay in producing a document it previously represented as non-existent, compels us to conclude that the IRS was guilty of affirmative misconduct at least as of June 30, 1984. Fredericks has met his burden of establishing the misrepresentation and affirmative-misconduct elements of an estoppel claim against the government. We, therefore, proceed to an examination of the reliance and detriment elements of this doctrine.

## IV.

### RELIANCE

■■ Parties claiming equitable estoppel must demonstrate not only that they relied on the alleged misrepresentations, but also that such reliance was reasonable "in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." Crawford County, 467 U.S. at 59, 104 S.Ct. at 2223. Fredericks argues that if he had known the IRS was in possession of the Form 872–A, he would have filed the necessary document (Form 872–T) to terminate the indefinite consent. Relying on the IRS' misrepresentation that the Form 872–A was not in his file, followed by the IRS' repeated requests for Form 872 agreements, Fredericks concluded that it was unnecessary to terminate a consent agreement which the IRS maintained that it never received. He concluded that the subsequent Forms 872 were the only agreements relevant to his 1977 return. On June 30, 1984, when the last one-year Form 872 extension expired, Fredericks believed that the statute of limitations prevented the IRS from assessing any deficiencies.

We conclude that Fredericks acted reasonably in relying on the IRS' misrepresentation that the Form 872–A was not in his file, and in relying on the subsequent Forms 872 executed by him and the IRS. Fredericks' reliance would have been unreasonable had it been based solely on the initial oral misrep-

resentation that the Form 872–A was "probably lost in the mail." But in this case, the IRS repeatedly confirmed its stated position for three years by requesting on three separate occasions the one-year Form 872 extensions. The language of the Form 872 agreements is clear and unequivocal. The third Form 872 executed by the taxpayer stated:

[Fredericks] and the District director of Internal Revenue consent and agree to the following:

(1) that the amount of any Federal [Income] tax due on any return(s) made or for the above taxpayer(s) for the period(s) ended [December 31, 1977 ...] may be assessed at any time on or before [June 30, 1984].

J.A. 61a.

We believe that Fredericks' reliance on the text of this written IRS form was reasonable. Reading this form in conjunction with the IRS' earlier statements, Fredericks reasonably concluded that June 30, 1984 was the last date for the IRS to assess a deficiency on his 1977 tax return. The IRS itself has characterized a similar Form 872–B as "a contract," and urged us to read its terms literally. *See Walsonavich v. United States,* 335 F.2d 96, 99 (3d Cir.1964). The taxpayers' reliance on the terms of such contracts is reasonable. *See, e.g., Woodworth v. Kales,* 26 F.2d 178 (6th Cir.1928).

The IRS now suggests that Fredericks is attempting to circumvent the requirement that taxpayers can terminate a Form 872–A only by filing a Form 872–T. However, Fredericks is not arguing, as the Tax Court suggested, that mere execution of a Form 872 negates the terms of a valid Form 872–A. Tax Ct.Op. at 7; *see Kernen v. Commissioner,* 902 F.2d 17, 18 (9th Cir.1990). He concedes he read Form 872–A and understood the procedures set forth therein for terminating that form. He argues that the IRS misled him to believe there was no Form 872–A on file; and that he reasonably relied on the IRS' misrepresentations and concluded there was no need to terminate the nonexistent form. We believe this was not only *a* reasonable conclusion, but *the only* reasonable conclusion that a taxpayer could draw from the IRS' conduct.

As indicated above, courts examining claims of estoppel against the government have looked beyond mere reasonableness to determine whether the alleged reliance was sufficient to invoke estoppel. Courts are more likely to find the reliance reasonable in governmental-estoppel claims if three additional factors exist: (1) if the government agents had authority to engage in the acts or omissions at issue; (2) if the agents' misrepresentation was one of fact, not law; and (3) if the government benefitted from its misrepresentation. We will address each of these in turn to illuminate the appropriateness of estoppel in this instance.

### A.

Courts have held that a private party's reliance on governmental actions or omissions is not reasonable if such acts or omissions are contrary to the law or beyond the agents' authority. We stated the rule in *Ritter v. United States:*

The acts or omissions of the officers of the government, if they be authorized to bind the United States in a particular transaction, will work estoppel against the government, if the officers have acted within the scope of their authority.

28 F.2d 265, 267 (3d Cir.1928). *See also Manloading & Mgmt. Assocs. v. United States,* 198 Ct.Cl. 628, 461 F.2d 1299 (1972); *Walsonavich v. United States,* 335 F.2d 96 (3d Cir.1964); *J. Homer Fritch, Inc. v. United States,* 236 F. 133, 134 (9th Cir.1916). In *Ritter,* a taxpayer attempted to estop the IRS from invoking the statute of limitations to bar the taxpayer's request for a refund. The taxpayer claimed an IRS agent told him that filing a formal request during the limitations period was unnecessary. We refused to estop the IRS, finding the taxpayer's alleged reliance unreasonable because IRS employees lack the authority to waive statutory or regulatory filing requirements. *Cf. Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (refusing to apply estoppel based on the actions of Navy employee relations personnel because the party asserting estoppel sought benefits not authorized by statute);

*Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (rejecting estoppel claim because employee of the Federal Crop Insurance Corporation had no authority to advise plaintiffs that their wheat crop was insurable).

Here, the government does not dispute that the IRS had the authority to inform Fredericks that it did not have the Form 872–A, nor does the government dispute that the IRS had the authority to solicit or terminate agreements extending the statute of limitations. To the contrary, the government's counsel at oral argument suggested that IRS agents routinely enter such agreements. Moreover, the government has conceded that the IRS had an obligation—not merely the authority—to notify Fredericks that it had the Form 872–A when it realized its error and that Fredericks had been misled. The agents here acted within the scope of the law and their authority. Therefore, we conclude Fredericks' reliance on their acts and misleading silence was reasonable.

### B.

Courts are more likely to apply estoppel when the government's conduct involves a misrepresentation of fact, rather than a misrepresentation of law. *See, e.g., Miller v. United States,* 500 F.2d 1007 (2d Cir.1974); *Estate of Emerson v. Commissioner,* 67 T.C. 612, 1977 WL 3636 (1977); *Exchange & Sav. Bank of Berlin v. United States,* 226 F.Supp. 56, 58 (D.Md.1964). However, some courts have gone further and invoked estoppel against the IRS even where the misrepresentation involved a question of law. *See Schuster v. Commissioner,* 312 F.2d 311 (9th Cir. 1962) (IRS estopped from correcting prior mistake of law on which bank reasonably relied); *Stockstrom v. Commissioner,* 190 F.2d 283 (D.C.Cir.1951); *Joseph Eichelberger & Co. v. Commissioner,* 88 F.2d 874 (5th Cir.1937). We need not go that far because in this case the IRS misrepresented its possession of a Form 872–A consent agreement. This was a misrepresentation of fact, not of law; and we find Fredericks' reliance thereon to be reasonable.

### C.

Courts are more willing to estop the government when the government itself benefited from the acts or omissions relied upon by the private party. *See, e.g., Walsonavich v. United States,* 335 F.2d 96 (3d Cir.1964) (IRS benefited from agreement to extend the statute of limitations for assessing deficiencies, and taxpayer was justified in relying on the same agreement to extend the period for filing a refund); *Joseph Eichelberger & Co. v. Commissioner,* 88 F.2d 874, 875 (5th Cir. 1937) ("The United States got the benefit of [the Commissioner's] decision then and ought to abide by it now."); *Staten Island Hygeia Ice & Cold Storage Co. v. United States,* 85 F.2d 68 (2nd Cir.1936) ("The United States got the benefit of [the Commissioner's] decision then and ought to abide by it now."); *Staten Island Hygeia Ice & Cold Storage Co. v. United States,* 85 F.2d 68 (2d Cir.1936) (IRS is bound by the burdens as well as the benefits of taxpayer's agreement to waive future claims).

One case focussing on the benefits obtained by the government has facts strikingly similar to those in the case at bar. In *Stockstrom v. Commissioner,* 190 F.2d 283 (D.C.Cir.1951), the taxpayer made gifts of less than $5,000 to several trusts in 1938. The IRS had ruled in 1937 that no gift tax was due on such transfers. An IRS officer affirmed this position in 1941, telling the taxpayer that no tax was due on his 1938 gifts. The taxpayer relied on the IRS' representations and, because no tax was due, did not file a gift tax return covering the 1938 transfers. In 1948, the IRS attempted to assess a deficiency based on the 1938 gifts, arguing that there was no statute of limitations on the assessment because the taxpayer never filed a return. The D.C. Circuit estopped the Commissioner from assessing the deficiency, finding that the taxpayer's failure to file a return was due entirely to the actions of the IRS. The court held: "[The Commissioner] induced the omission which he now relies upon as giving him unlimited time to assess a tax. The law as to such a situation has long since been established. . . . He who prevents a thing from being done may not avail himself of the non-performance

which he has himself occasioned,...." *Id.* 190 F.2d at 288.

As in *Stockstrom,* the IRS induced the omission which it relies upon in assessing a deficiency against Fredericks. The IRS misrepresented that it did not have the Form 872–A, induced Fredericks to rely on three subsequently executed Forms 872 to aid the government in its investigation, and induced him to reasonably believe there was no Form 872–A to terminate. The government now attempts to benefit from Fredericks' failure to terminate this form many years after its initial misrepresentation and many years after its realization of—and silence regarding—its own error. As the D.C. Circuit stated in *Stockstrom,* "[w]e regard as unconscionable the Commissioner's claim of authority to assess a tax ... when the Commissioner himself was responsible for that failure." *Id.* 190 F.2d at 289.

## V.

### DETRIMENT

■ "To analyze the nature of a private party's detrimental change in position, we must identify the manner in which reliance on the Government's misconduct has caused the private citizen to change his position for the worse." *Crawford County,* 467 U.S. at 61, 104 S.Ct. at 2224. Fredericks argues that he suffered a substantial economic detriment by relying on the IRS' misrepresentations. He reasonably relied on the third Form 872 and reasonably believed that the statute of limitations expired on June 30, 1984. he relied on the IRS' misrepresentations that there was no Form 872–A indefinite extension of the statute of limitations and, to his detriment, did not terminate that form. Fredericks permanently lost his right to terminate the Form 872–A and he lost the benefit of the statute of limitations in the third Form 872. Moreover, he was penalized by the IRS' application of an enhanced rate of interest that continues to be compounded daily. This interest accrued while the IRS waited eight years after the June 30, 1984 statute of limitations expired to assess a deficiency.

To understand the nature of the detriment Fredericks suffered, we must consider the interest rate charged on his underpayment. Section 6601 of the Internal Revenue Code (26 U.S.C.) provides rules for the accrual of interest on tax underpayments. Section 6601(a) provides that interest on underpayments accrues at a rate established under § 6621, and continues to accrue until the taxpayer pays the overdue amount. Appendix A illustrates the underpayment rates that have been in effect under § 6621 since June 30, 1984.

On January 1, 1985, six months after Fredericks reasonably believed that the statute of limitations had expired, the government began to calculate interest on Fredericks' liability at an even higher rate. Section 6621(c) provided an increased rate for "substantial underpayments attributable to tax motivated transactions." *See* Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 144, 98 Stat. 682 (1984) (effective with respect to interest accruing after December 31, 1984), *repealed by* Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239, § 7721, 103 Stat. 2106 (1989) (effective for returns the due date for which is after December 31, 1989).

The Tax Court's order in this case stated that Fredericks' liability "is a substantial underpayment attributable to tax-motivated transactions, for purposes of computing the interest payable with respect to such amount, pursuant to I.R.C. § 6621(c)." Tax Court Order dated August 8, 1996. The increased rate under § 6621(c) is 120% of the ordinary underpayment rate. This interest is compounded daily pursuant to § 6621(a). Appendix B shows the penalty-enhanced interest rates applicable after December 31, 1984.

The detriment Fredericks suffered becomes readily apparent by comparing the penalty-enhanced rates to those he could have earned in savings accounts, certificates of deposit, treasury securities or top-rated corporate bonds. *See* Appendix C. Concededly, Fredericks retained and could have earned interest on $28,361 that he owed to the IRS, but even in a best-case scenario he could not have earned the amount of interest the government now seeks to collect. This fact is dramatically illustrated by comparing

the penalty-enhanced interest charged by the government, as set forth in Appendix B, with the market interest rates shown in Appendix C. This penalty—this economic detriment—is more than a mere technicality because the amount of interest involved here greatly exceeds the underlying liability.

At oral argument, Fredericks stated: "from direct numbers that the government has given me . . . the interest is about $158,000." This figure is more than five times the underlying tax deficiency of $28,361. Counsel for the IRS responded to a question about the amount of interest the government charged Fredericks by stating:

> I don't dispute Mr. Fredericks' estimate that it might be a hundred and fifty thousand dollars in this case. I don't know for certain, but I would not dispute that.

The government relies on the reasoning in *Crawford County* and argues that Fredericks obtained a benefit, rather than a detriment, by the IRS' delay. The government contends that he was allowed to retain money to which he was not entitled, money owed to the IRS in 1978. In our view, the case at bar stands in stark contrast with *Crawford County.*

In *Crawford County,* the Court found no detriment because the private party had suffered only "the inability to retain money that it never should have [kept] in the first place." 467 U.S. at 61, 104 S.Ct. at 2225. Fredericks' detriment arises not from his inability to retain the $28,361, which he admittedly should have paid the government in 1978. His detriment results from the loss of his right to terminate the Form 872–A and the high rate of interest he is being charged, interest that accrued while Fredericks reasonably believed assessments were barred by the statute of limitations. Fredericks was not "merely . . . induced to do something which could be corrected later." *Id.* at 62, 104 S.Ct. at 2225. He was induced to forfeit his right to terminate the Form 872–A consent agreement. The IRS' subsequent action was not simply a correction of prior misrepresentations, it was a penalty compounded daily as the IRS continued its 12–year investigation well beyond the statute of limitations for any assessments. We conclude these are sufficient detriments to establish an estoppel defense.

As we have observed, courts must consider additional factors when estoppel is asserted against the government and one such factor is whether the government's action permanently deprived the party claiming estoppel of a benefit or right to which it was entitled. For example, in *Payne v. Block,* 714 F.2d 1510, 1517–1518 (11th Cir.1983), the court effectively estopped the government from closing a loan application period because government agents failed to advertise the loans. Estoppel was appropriate in part because the loan applicants would forever lose their opportunity to apply unless the government was estopped from closing the application period. *Id.* 714 F.2d at 1518; *accord Vestal v. Commissioner,* 152 F.2d 132, 135 (D.C.Cir. 1945) (estopping IRS from changing its characterization of taxable entity in part because the statute of limitations had expired; "restoration to the taxpayers of the taxes originally collected being impossible," estoppel was appropriate).

The court in *Payne* distinguished *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981), a case in which the Court refused to estop the Secretary of Health and Human Services. In *Schweiker,* a government agent erroneously told a Social Security claimant she was ineligible for benefits. Relying on this false information, the claimant did not file an application until 10 or 11 months later, after discovering she was indeed eligible. The claimant asserted equitable estoppel against the government, arguing that she should receive retroactive benefits for the time during which she relied on the employee's misrepresentation. The Court rejected her argument and noted that the claimant suffered no permanent loss of a legal right because she could, and did, submit an application at a later date. *Id.* at 789, 101 S.Ct. at 1471.

Like the loan applicants in *Payne,* and unlike the claimant in *Schweiker,* Fredericks suffered a permanent loss of a legal right. He forever lost his right to terminate the Form 872–A, the only means through which the government could in 1992 assess his 1977 tax return. He was irreversibly deprived of

the benefit of the three-year statute of limitations enacted by Congress, the benefit of the terms of the contracts he entered with the IRS to extend that period, and of any opportunity to terminate the revocable 872–A that the IRS misrepresented as lost. The loss of this right created a tangible economic detriment in the form of penalty-enhanced interest rates. Accordingly, we find that Fredericks has satisfied the detriment element of an equitable estoppel claim against the government.

## VI.

### ESTOPPEL AND THE GOVERNMENT

The Supreme Court has not directly met the issue whether estoppel against the IRS may be appropriate in certain circumstances. However, contrary to counsel for the Commissioner's emphatic statement at oral argument that in no case has estoppel been asserted successfully against the IRS, this court and others have applied the doctrine of estoppel to the IRS under various circumstances. In *Walsonavich v. United States*, 335 F.2d 96 (3d Cir.1964), we held that the IRS was estopped from asserting the statute of limitations as a defense to a taxpayer's claim for a refund where the government and taxpayer had entered a written agreement extending the statute of limitations. *See also Miller v. United States*, 500 F.2d 1007 (2d Cir.1974) (IRS estopped from relying on a statute of limitations contained in a previously signed waiver-of-notice form as a bar to taxpayer's refund claim, where the IRS had erroneously disregarded the waiver, unnecessarily issued the notice to taxpayer and, pursuant to the notice, the statute of limitations had not run); *Staten Island Hygeia Ice & Cold Storage Co. v. United States*, 85 F.2d 68 (2d Cir.1936) (equitable relief available against IRS where erroneous advice induced taxpayer to enter agreement with IRS waiving future claims for refund); *Schuster v. Commissioner*, 312 F.2d 311 (9th Cir.1962) (IRS estopped from correcting prior erroneous determination of estate tax where bank relied on that determination and disposed of the affected assets); *Time Oil Co. v. Commissioner*, 258 F.2d 237 (9th Cir.1958) (IRS estopped from recouping tax advantages obtained by employer where default was in part triggered by Commissioner); *United States v. Brown*, 86 F.2d 798, 799 (6th Cir.1936) (IRS, after exercising choice to pursue one of two available remedies while letting alternative theory "slumber in the files," is bound by that choice and cannot later pursue the inconsistent alternative remedy); *Woodworth v. Kales*, 26 F.2d 178 (6th Cir.1928) (avoiding direct estoppel ruling, but holding that Commissioner and his successors cannot reopen, reconsider and assess taxpayer's return—even within the statute of limitations period—once an initial valuation of certain stock had been made and indirectly confirmed by two subsequent commissioners); *Simmons v. United States*, 308 F.2d 938 (5th Cir.1962) (finding "persuasive" plaintiff's argument that IRS should be estopped from imposing a tax contrary to its agent's advice); *Joseph Eichelberger & Co. v. Commissioner*, 88 F.2d 874 (5th Cir.1937) (where IRS had rejected the existence of a loss claimed by a taxpayer, IRS was estopped for purposes of another transaction from subsequently claiming such loss was indeed realized); *Perkins v. Thomas*, 86 F.2d 954 (5th Cir.1936) (IRS estopped from making deductions based on a depletion allowance for the sale of mineral interests where IRS previously rejected taxpayer's claim for that depletion allowance in an earlier determination of tax owed on a sale of related interests); *Stockstrom v. Commissioner*, 190 F.2d 283 (D.C.Cir.1951) (IRS estopped from assessing taxpayer's estate in 1948 for failure to file a 1938 return where Commissioner had seven years earlier ruled that no tax was owed); *Vestal v. Commissioner*, 152 F.2d 132, 135 (D.C.Cir.1945) (IRS estopped from characterizing and taxing transaction as one involving a corporation where IRS agent previously deemed and taxed the transaction as one involving a partnership); *Exchange & Sav. Bank of Berlin v. United States*, 226 F.Supp. 56 (D.Md.1964) (IRS estopped from relying on the statute of limitations period in a previously signed irrevocable waiver because IRS subsequently inadvertently sent taxpayer a notice stating that the limitations period began running at a later date); *Smale & Robinson, Inc. v. United States*, 123

F.Supp. 457 (S.D.Cal.1954) (IRS estopped from raising statute-of-limitations defense to taxpayer's claim where authorized agent "proposed and affirmatively represented, by words and figures placed in [a] report," that an unused credit from earlier tax year would be allowed without the taxpayer having to make a formal claim); *see also H.S.D. Co. v. Kavanagh*, 191 F.2d 831 (6th Cir.1951) (not directly referencing "estoppel doctrine," but holding that a subsequent commissioner is barred from changing a ruling expressed in two letters of former commissioner upon re-examination of the taxpayer's file); *Ford Motor Co. v. United States*, 81 Ct.Cl. 30, 9 F.Supp. 590 (1935) (not directly mentioning "estoppel" though effectively estopping IRS from changing its characterization of corporations as separate entities after treating them as such throughout multiple transactions).

The IRS is not the only federal agency against which courts have applied the doctrine of estoppel. Case law demonstrates that courts have invoked estoppel against the Post Office Department, the Department of Housing and Urban Development, the Land Management Office, the Postal Service, the Parole Commission, the Farmer's Home Administration, the War Department, the Department of Interior, the Department of Commerce and Labor and the General Land Office.[3] This plethora of precedent suggests that "[i]t is well settled that the doctrine of equitable estoppel, in proper circumstances, and with appropriate caution, may be invoked against the United States in cases involving internal revenue taxation," and in a variety of other contexts. *Simmons v. United States*, 308 F.2d 938, 945 (5th Cir.1962).

Although the Supreme Court has neither rejected outright nor articulated a

---

**3.** *Dana Corp. v. United States*, 200 Ct.Cl. 200, 470 F.2d 1032 (1972) (Post Office Department estopped from denying effects of agent's decision to continue to pay and not inform plaintiff-supplier that it was performing in excess of contract requirements); *Manloading & Mgmt. Assocs. v. United States*, 198 Ct.Cl. 628, 461 F.2d 1299 (1972) (Department of Housing and Urban Development estopped from denying renewal of contract with plaintiff where authorized agent had assured prospective bidders that funds were available and contract would be renewed); *Branch Banking & Trust Co. v. United States*, 120 Ct.Cl. 72, 98 F.Supp. 757, 766–769 (1951) (War Department estopped from denying payment of fees for additional costs incurred by party that entered contract with government where government agents repeatedly authorized such fees and allowed contractor to proceed as though fees would be paid); *Brandt v. Hickel*, 427 F.2d 53 (9th Cir.1970) (estopping Land Management Office from denying bidder priority where agent gave erroneous advice that resubmitting proposal would not result in loss of priority); *Portmann v. United States*, 674 F.2d 1155 (7th Cir.1982) (holding U.S. Postal Service may be estopped from claiming packages were merchandise and from applying lower insurable limit if plaintiff could prove that postal clerk assured her the packages could be insured as non-negotiable documents up to a higher limit); *Johnson v. Williford*, 682 F.2d 868 (9th Cir. 1982) (Parole Commission estopped from revoking petitioner's parole and enforcing nonparolability provision of statute where Parole Commission erroneously released petitioner who had successfully reintegrated himself into the community); *United States v. Jones*, 176 F.2d 278 (9th Cir.1949) (War Assets Administration estopped from revoking sale of surplus goods on ground that sale price was too low where agents had authority to negotiate the contract for sale); *J. Homer Fritch, Inc. v. United States*, 236 F. 133, 134 (9th Cir.1916) (Department of Commerce and Labor estopped from denying effect of extension of an option to charter a vessel where government had requested said extension); *United States v. Big Bend Transit Co.*, 42 F.Supp. 459, 474 (E.D.Wash.1941) (Department of Interior estopped from denying validity of grants of water rights to corporation where granting agents were clearly authorized to issue grants and corporation, relying on those grants, expended money toward development); *Walker v. United States*, 139 F. 409, 412–414 (C.C.M.D.Ala.1905) (Treasury Department estopped from collecting overpayments it made over several years in form of compensation by opening and vacating settlements it entered with the individual where entering such settlements constitutes "affirmative acts" of government, government delayed asserting its intention to vacate settlements and affirmatively changed its position to individual's prejudice); *Payne v. Block*, 714 F.2d 1510, 1517–1518 (11th Cir. 1983) (affirming district court order compelling Farmers Home Administration to extend loan application period, i.e., effectively estopping the government from adhering to the previously established deadline because government agents failed to notify potential applicants of loans); *Lindsey v. Hawes*, 67 U.S. (2 Black) 554, 560, 17 L.Ed. 265 (1862) (not directly mentioning "estoppel," but effectively estopping the Commissioner of the General Land Office from correcting a prior land survey and land sale based thereon).

specific test for estoppel claims against the government, the foregoing case law illuminates certain factors beyond the traditional elements of estoppel that we should consider before estopping the IRS. Those factors are: 1) the impact of the estoppel on the public fisc; 2) whether the government agent or agents who made the misrepresentation or error were authorized to act as they did; 3) whether the governmental misconduct involved a question of law or fact; 4) whether the government benefitted from its misrepresentation; and 5) the existence of irreversible detrimental reliance by the party claiming estoppel. We have addressed all but the first factor in conjunction with the traditional elements of estoppel, and we conclude that each of those factors cuts in favor of Fredericks. We now proceed to consider the impact on the public fisc in this case.

### Impact on the Public Fisc

Courts are more likely to estop the government when the public fisc—in particular, Congress' power to control public expenditures—is only minimally impacted, if at all. This consideration derives from *Schweiker v. Hansen*, 450 U.S. 785, 790–793, 101 S.Ct. 1468, 1471–74, 67 L.Ed.2d 685 (1981). The Court in *Schweiker* observed that future cases could be distinguished if the government entered written agreements that supported estoppel or if estoppel did not threaten the public fisc. Accordingly, in *Portmann v. United States*, 674 F.2d 1155 (7th Cir. 1982), the court held that the U.S. Postal Service could be estopped from claiming certain packages were merchandise and from applying a lower insurable limit than that which would apply if the packages were deemed nonnegotiable documents. The court ruled that estoppel could be invoked if the plaintiff proved that the postal clerk assured her the packages could be insured as nonnegotiable documents. Important to the court's conclusion was that the public fisc would not be endangered if estoppel were permitted. The Seventh Circuit also articulated certain factors to be balanced in determining whether to grant estoppel. Among those factors was the potential danger of undermining important federal interests or risking severe depletion of the public fisc. *Id.* 674 F.2d at 1167.

We discussed *Payne v. Block*, 714 F.2d 1510, 1517–1518 (11th Cir.1983), in our analysis of the detriment element in Part IV. The court in *Payne* affirmed a district court order compelling the Farmers Home Administration to extend a loan application period, effectively estopping the government from adhering to its previously established application deadline. The court distinguished *Schweiker v. Hansen* on several grounds. Among these grounds was that in *Schweiker* estoppel would have threatened the public fisc with potential fraudulent claims by allowing any eligible claimants to obtain retroactive benefits by merely claiming that they visited the Social Security office and were told they were ineligible. In contrast, no threat of fraudulent claims existed in *Payne* because Congress had already authorized the funds for the loan program at issue and the money remained unallocated.

The public-fisc consideration cuts in favor of estopping the government in the case at bar. By enacting a three-year statute of limitations on the time within which the IRS must assess tax deficiencies, Congress clearly contemplated that in some instances taxpayers would retain funds—because the statute of limitations had run—to which they were not initially entitled. Therefore, invoking the statute of limitations to bar an IRS assessment cannot be deemed an intrusion into Congress' power to expend and allocate public funds. Neither Congress' power to control public expenditures nor its authority to enact statutes of limitations is impacted when a taxpayer invokes such a statute, either at the end of its original life or 11 years later pursuant to written agreements between the taxpayer and IRS.

Estoppel in this instance would not open the door to fraudulent claims. Therefore, the concerns about such claims raised in *Portmann* and *Schweiker* are inapplicable here. Unlike in *Schweiker* and *Portmann*, Fredericks' claim is based on more than mere oral assurances from government officials, although the government does not deny that its agent orally informed Fredericks that it did not have an extension on file and

that the Form 872–A was probably lost. In this case, Fredericks proved, with documents authorized by Congress and signed by IRS agents, that the IRS executed three written agreements establishing specific dates on which the statute of limitations would expire. Thus, the *Schweiker* Court's concerns about a governmental estoppel that would open the door to potentially costly fraudulent claims based on mere oral misrepresentations from government officials are inapposite here.

The impact on the public fisc in this case would be nothing greater than that authorized by Congress in enacting a statute of limitations and authorizing the IRS to enter Form 872 written agreements extending the limitations period to specific dates. Congress certainly contemplated that taxpayers would rely on the dates fixed in those agreements to bar IRS assessments to which the government is no longer entitled because of the passage of time. *See Helvering v. Griffiths*, 318 U.S. 371, 403, 63 S.Ct. 636, 653, 87 L.Ed. 843 (1943) ("the statute of limitations bar[s] sometimes the Government and sometimes the taxpayer with capricious effects").

Estoppel here affects the public fisc by approximately $28,361, plus any interest that would have accrued before June 30, 1984— the day the statute of limitations in the last Form 872 signed by the IRS and Fredericks expired. We are satisfied that in the scope of the IRS' operations, this impact on the public fisc is not only minimal, but also a necessary result of Congress' enactment of enforceable statutes of limitations.

We conclude that Fredericks has met his burden of establishing the traditional elements of estoppel. The IRS misrepresented its possession of a Form 872–A indefinite extension of the statute of limitations and confirmed that misrepresentation by obtaining three Forms 872. The IRS' conduct constituted affirmative misconduct when it remained silent upon realizing its mistake and upon deciding to change its course of action to rely on the previously lost Form 872–A without notifying the taxpayer. Its decision to effectively revoke the third Form 872 without notice to the taxpayer also adds to the affirmative misconduct here. Fredericks relied upon the IRS' oral and written

representations as to the relevant statute of limitations and lost his right to terminate the Form 872–A. His detriment is compounded by the IRS' assessment of an increased penalty rate of interest covering the entire duration of its protracted investigation.

We have addressed the special factors that must be considered in governmental-estoppel claims and we conclude that they favor estopping the IRS here. The impact on the public fisc is minimal and consistent with Congress' enactment of enforceable statutes of limitations. The acts and omissions of the IRS agents were authorized; the errors involved misrepresentations of fact, not law, and do not contravene any statutory or regulatory requirements. The government benefitted from its misrepresentations; and Fredericks relied on those misrepresentations to his detriment, irretrievably losing the benefit of the statute of limitations, the benefit of the contracts he entered with the IRS, and the right to terminate the Form 872–A that the government repeatedly and affirmatively represented as non-existent.

Having concluded that the IRS is estopped from relying on the Form 872–A to extend the statute of limitations, we hold that the Commissioner was time-barred from making any assessment, in full or in part, in 1992. The original three-year statute of limitations had run, as had the three one-year extensions agreed to by the parties. Any assessment by the IRS on Fredericks' 1977 tax return was time-barred by 1984. The taxpayer asserted the statute of limitations as a defense to a 1992 assessment, and the Commissioner is thus estopped from refusing to recognize that defense and from denying the effectiveness of the 1984 statute of limitations.

The dissent agrees that the IRS should be estopped, but argues that we should allow the government to assess a deficiency for the period before September 30, 1984–90 days after the last Form 872 one-year extension expired. This contention fails to recognize the precise nature of the estoppel here. The Commissioner is estopped from using the Form 872–A to deny that the statute of limitations had run in 1984. Thus, the entire 1992 assessment was time-barred. By oper-

ation of the estoppel doctrine, the Commissioner was stripped of authority to make any assessment whatsoever. The effect of the estoppel here does not raise a question of "equities"; it presents one of pure law—the operation of a statute that bars the Commissioner's action beyond a date certain.

Application of estoppel here does not merely limit the remedy available to the Commissioner; it negates the Commissioner's ability to trump an act of Congress, to wit, the statute of limitations. As stated above, by enacting a statute of limitations on the time for assessing tax deficiencies, Congress clearly contemplated that in some instances taxpayers would retain funds—because the limitations period had run—to which they were not initially entitled. That this may result in an "unnecessary windfall" to the party invoking the statute of limitations is totally irrelevant. Such is the nature of a congressionally enacted limitations period; it confers a benefit on any litigant asserting the defense. To be sure, "the statute of limitations bar[s] sometimes the Government and sometimes the taxpayer with capricious effects." *See, e.g., Helvering v. Griffiths,* 318 U.S. 371, 403, 63 S.Ct. 636, 653, 87 L.Ed. 843 (1943).

Estopping the government from capitalizing on Fredericks' failure to file an 872–T termination form, when the IRS itself procured both Fredericks' omission and his reliance on the alternative Forms 872, is not only consistent with more than a century of precedents, but also essential to maintaining fundamental notions of fair play. The Supreme Court has recognized such fundamental principles and applied them against both private parties and the government.

In *R.H. Stearns Co. v. United States,* 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647 (1934), the Court held that a taxpayer was estopped from asserting the statute of limitations as a bar to an assessment where the taxpayer himself had requested the Commissioner to delay the assessment. The Court stated:

> The applicable principle is fundamental and unquestioned. He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned, for the law says to him, in effect: This is your own act, and therefore you are not damnified.... Sometimes the resulting disability has been characterized as an estoppel, sometimes as a waiver. The label counts for little. Enough for present purposes that the disability has its roots in a principle more nearly ultimate than either waiver or estoppel, the principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong. A suit may not be built on an omission induced by him who sues.

*Id.* at 61–62, 54 S.Ct. at 328 (citations and internal quotations omitted). The taxpayer claimed that a waiver of the statute of limitations that he signed, but which the Commissioner did not sign until several years later, was invalid. The Court noted that all parties proceeded as though the waiver was on file and had been signed: "[t]he events that followed confirm this interpretation of the effect of the transaction." Therefore, the taxpayer was estopped from later claiming that the waiver was invalid. The facts in the case at bar are strikingly similar, and the same principles of law and equity should apply.

Here, all parties proceeded as though the IRS did not possess a Form 872–A. The events that followed, the IRS' three requests for Forms 872 and its silence upon finding the Form 872–A, confirmed this interpretation of the facts. We conclude that the same principle that the Court has applied against taxpayers—the principle that those who prevent a thing from being done may not avail themselves of the nonperformance which they themselves have occasioned—must apply to the Commissioner as well as the taxpayer in this instance. *See, e.g., United States v. Peck,* 102 U.S. (12 Otto) 64, 26 L.Ed. 46 (1880) (applying these fundamental principles of equity against the government as a party to a contract with a private individual).

\* \* \* \* \* \*

Because we rule the Commissioner is estopped from asserting a deficiency in the 1977 tax return of Barry I. Fredericks, the decision of the Tax Court will be reversed.

## APPENDIX A [1]
### INTEREST RATES ON UNDERPAYMENTS
#### Jul. 1, 1984—Sep. 30, 1997

| | | | |
|---|---|---|---|
| Jul. 1, 1984—Dec. 31, 1984 | 11% | Oct. 1, 1991—Dec. 31, 1991 | 10% |
| Jan. 1, 1985—Jun. 30, 1985 | 13% | Jan. 1, 1992—Mar. 31, 1992 | 9% |
| Jul. 1, 1985—Dec. 31, 1985 | 11% | Apr. 1, 1992—Jun. 30. 1992 | 8% |
| Jan. 1, 1986—Jun. 30, 1986 | 10% | Jul. 1, 1992—Sep. 30, 1992 | 8% |
| Jul. 1, 1986—Dec. 31. 1986 | 9% | Oct. 1, 1992—Dec. 31, 1992 | 7% |
| Jan. 1, 1987—Mar. 31, 1987 | 9% | Jan. 1, 1993—Mar. 31, 1993 | 7% |
| Apr. 1, 1987—Jun. 30, 1987 | 9% | Apr. 1, 1993—Jun. 30, 1993 | 7% |
| Jul. 1, 1987—Sep. 30, 1987 | 9% | Jul. 1, 1993—Sep. 30, 1993 | 7% |
| Oct. 1, 1987—Dec. 31, 1987 | 10% | Oct. 1, 1993—Dec. 31, 1993 | 7% |
| Jan. 1, 1988—Mar. 31, 1988 | 11% | Jan. 1, 1994—Mar. 31, 1994 | 7% |
| Apr. 1, 1988—Jun. 30, 1988 | 10% | Apr. 1, 1994—Jun. 30, 1995 | 7% |
| Jul. 1, 1988—Sep. 30, 1988 | 10% | Jul. 1, 1994—Sep. 30, 1994 | 8% |
| Oct. 1, 1988—Dec. 31, 1988 | 11% | Oct. 1, 1994—Dec. 31, 1994 | 9% |
| Jan. 1, 1989—Mar. 31, 1989 | 11% | Jan. 1, 1995—Mar. 31, 1995 | 9% |
| Apr. 1, 1989—Jun. 30, 1989 | 12% | Apr. 1, 1995—Jun. 30, 1995 | 10% |
| Jul. 1, 1989—Sep. 30, 1989 | 12% | Jul. 1, 1995—Sep. 31, 1995 | 9% |
| Oct. 1, 1989—Dec. 31, 1989 | 11% | Oct. 1, 1995—Dec. 31, 1995 | 9% |
| Jan. 1, 1990—Mar. 31, 1990 | 11% | Jan. 1, 1997—Mar. 31, 1997 | 9% |
| Apr. 1. 1990—Jan. 30, 1990 | 11% | Apr. 1, 1996—Jun. 30, 1996 | 8% |
| Jul. 1, 1990—Sep. 30, 1990 | 11% | Jul. 1, 1997—Sep. 30, 1996 | 9% |
| Oct. 1, 1990—Dec. 31, 1990 | 11% | Oct. 1, 1996—Dec. 31, 1996 | 9% |
| Jan. 1, 1991—Mar. 31, 1991 | 11% | Jan. 1, 1997—Mar. 31, 1997 | 9% |
| Apr. 1, 1991—Jun. 30, 1991 | 10% | Apr. 1, 1997—Jun. 30, 1997 | 9% |
| Jul. 1, 1991—Sep. 30, 1991 | 10% | Jul. 1, 1997—Sep. 30, 1997 | 9% |

1. Rates taken from Rev. Rul. 97–23, 1997–22 I.R.B. 10. The effective rate of interest is even higher than the figures shown, due to daily compounding under § 6622(a). *See* Rev. Rul. 95–17, 1995–1 C.B. 556 (containing tables for computation of interest using daily compounding rules).

## APPENDIX B [1]
### INTEREST RATES ON SUBSTANTIAL UNDERPAYMENTS UNDER § 6621(c)
#### Jan. 1, 1985—Sep. 30, 1997

| | | | |
|---|---|---|---|
| Jan. 1, 1985—Jun. 30, 1985 | 15.6% | Jan. 1, 1992—Mar. 31, 1992 | 10.8% |
| Jul. 1, 1985—Dec. 31, 1985 | 13.2% | Apr. 1, 1992—Jun. 30, 1992 | 9.6% |
| Jan. 1, 1986—Jun. 30, 1986 | 12.0% | Jul. 1, 1992—Sep. 30, 1992 | 9.6% |
| Jul. 1, 1986—Dec. 31, 1986 | 10.8% | Oct. 1, 1992—Dec. 31, 1992 | 8.4% |
| Jan. 1, 1987—Mar. 31, 1987 | 10.8% | Jan. 1, 1993—Mar. 31, 1993 | 8.4% |
| Apr. 1, 1987—Jun. 30, 1987 | 10.8% | Apr. 1, 1993—Jun. 30, 1993 | 8.4% |
| Jul. 1, 1987—Sep. 30, 1987 | 10.8% | Jul. 1, 1993—Sep. 30, 1993 | 8.4% |
| Oct. 1, 1987—Dec. 31, 1987 | 12.0% | Oct. 1, 1993—Dec. 31, 1993 | 8.4% |
| Jan. 1, 1988—Mar. 31, 1988 | 13.2% | Jan. 1, 1994—Mar. 31, 1994 | 8.4% |
| Apr. 1, 1988—Jun. 30, 1988 | 12.0% | Apr. 1, 1994—Jun. 30, 1994 | 8.4% |
| Jul. 1, 1988—Sep. 30, 1988 | 12.0% | Jul. 1, 1994—Sep. 30, 1994 | 9.6% |
| Oct. 1, 1988—Dec. 31, 1988 | 13.2% | Oct. 1, 1994—Dec. 31, 1994 | 10.8% |
| Jan. 1, 1989—Mar. 31, 1989 | 13.2% | Jan. 1, 1995—Mar. 31, 1995 | 10.8% |
| Apr. 1, 1989—Jun. 30, 1989 | 14.4% | Apr. 1, 1995—Jun. 30, 1995 | 12.0% |
| Jul. 1, 1989—Sep. 30, 1989 | 14.4% | Jul. 1, 1995—Sep. 31, 1995 | 10.8% |
| Oct. 1, 1989—Dec. 31. 1989 | 13.2% | Oct. 1, 1995—Dec. 31, 1995 | 10.8% |
| Jan. 1, 1990—Mar. 31, 1990 | 13.2% | Jan. 1, 1996—Mar. 31, 1996 | 10.8% |
| Apr. 1, 1990—Jun. 30, 1990 | 13.2% | Apr. 1, 1996—Jun. 30, 1996 | 9.6% |
| Jul. 1, 1990—Sep. 30, 1990 | 13.2% | Jul. 1, 1996—Sep. 30, 1996 | 10.8% |
| Oct. 1, 1990—Dec. 31, 1990 | 13.2% | Oct. 1, 1996—Dec. 31, 1996 | 10.8% |
| Jan. 1, 1991—Mar. 31, 1991 | 13.2% | Jan. 1, 1997—Mar. 31, 1997 | 10.8% |
| Apr. 1, 1991—Jun. 30, 1991 | 12.0% | Apr. 1, 1997—Jun. 30, 1997 | 10.8% |
| Jul. 1, 1991—Sep. 30, 1991 | 12.0% | Jul. 1, 1997—Sep. 30, 1997 | 10.8% |
| Oct. 1, 1991—Dec. 31, 1991 | 12.0% | | |

1. As with the figures in Appendix A, the effective rate of interest will be even higher due to daily compounding under § 6622(a)

## APPENDIX C

### Market Interest Rates

| Year | Savings Account [1]<br>Insured<br>Commercial Bank | CDs [2]<br>1–2½<br>Years | 2½<br>and Over | Treasury Securities [3]<br>One Year | Ten Year | Bonds 3<br>Corporate<br>(aaa) |
|------|------|------|------|------|------|------|
| 1985 | NA | 8.24% | 8.73% | 8.43% | 10.62% | 11.37% |
| 1986 | 5.24% | 6.22% | 6.61% | 6.46% | 7.68% | 9.02% |
| 1987 | 5.21%, | 7.46% | 7.86% | 6.76% | 8.38% | 9.38% |
| 1988 | 5.29% | 8.30% | 8.43% | 7.65% | 8.85% | 9.71% |
| 1989 | 5.53% | 7.88% | 7.86% | 8.54% | 8.50% | 9.26% |
| 1990 | 5.84% | 7.42% | 7.53% | 7.88% | 8.55% | 9.32% |
| 1991 | 4.30% | 4.95% | 5.52% | 5.86% | 7.86% | 8.77% |
| 1992 | 2.88% | 3.88% | 4.77% | 3.89% | 7.01% | 8.14% |
| 1993 | 2.46% | 3.55% | 4.28% | 3.43% | 5.87% | 7.22% |
| 1994 | 2.92% | 5.74% | 6.30% | 5.31% | 7.08% | 7.96% |
| 1995 | 3.10% | 5.17% | 5.40% | 5.95% | 6.58% | 7.59% |
| 1996 | NA | 5.22% | 5.46% | NA | NA | NA |

1. Statistics for Savings Accounts taken from Federal Reserve Board *Special Supplementary Table H.6* (1986–1989) and Federal Reserve Board *Annual Statistical Digest* (1990–1995). These figures represent the effective annual yield in the month of December for each year shown.

2. Statistics for CDs represent all interest-bearing time certificates and open account time deposits with balances of less than $100,000 including those held in IRAs and Keogh Plan deposits. Federal Reserve Board's Special Supplementary Table H.6 (1985–1989); Federal Reserve Board's Annual Statistical Digest (1990–1995).

3. Statistics for Treasury Securities and Corporate Bonds taken from *Business Statistics of the United States* 99–100 (Courtenay M. Slater, editor, 1996 ed.).

STAPLETON, J., concurring in part and dissenting in part:

I am persuaded that there is a basis for estopping the Commissioner in this case. As the court persuasively observes, the Service must have learned that it had the taxpayer's Form 872–A at some point prior to June 30, 1984, and, based on the Form 872s then in the taxpayer's file, must have realized that he expected the Commissioner's ability to assess a deficiency to terminate on that date.

I am not persuaded, however, that the Commissioner should be estopped from contending that *any* deficiency and interest is due. The only specific reliance the taxpayer claims in this case is his forbearance from revoking his Form 872–A. He insists that, had the Service informed him that it had his Form 872–A in 1984, he would have promptly exercised his right to revoke his indefinite waiver of the limitations period. If he had done so, however, the Service would have had 90 days to assess a deficiency, and the record indicates that it clearly would have done so to protect its position even though its investigation was not complete.[1] Thus, if the taxpayer had not been misled by the Service, he would have had to pay in the Fall of 1984 the deficiency found by the Tax Court to be due, with statutory interest up to that time.

Equitable estoppel is an equitable defense and should be tailored to fit the equities of the particular case. *Green v. Interstate United Management Services Corp.*, 748 F.2d 827, 830 (3d Cir.1984) ("[T]he equitable doctrine of estoppel [is] 'a flexible doctrine, to be applied ... as the equities between the parties preponderate.' "); Dobbs, *Law of*

1. In each of the three earlier instances in which the Service asked the taxpayer to execute a one-year extension, it advised him that a failure to grant an extension would cause it to immediately assess a deficiency.

*Remedies,* §§ 2.3(5) and 2.4(1). Estopping the Commissioner from contending that any of the deficiency and interest he has assessed is due will result in an unnecessary windfall to the taxpayer. In order to avoid such a windfall, I would hold that the Commissioner is estopped from contending that any amount is due in excess of the deficiency found by the Tax Court, statutory interest up until September 30, 1984, and market rate interest from that date until payment.