In re CHARTER BEHAVIORAL HEALTH SYSTEMS, LLC, et al., Debtors.

Nos. 00–989(MFW) to 00–1089(MFW), 00–1555(MFW), 00–2231(MFW) to 00–2237(MFW).

United States Bankruptcy Court, D. Delaware.

April 8, 2003.

Laura Davis Jones, Rachel Lowy Werkheiser, Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C., Wilmington, DE, Douglas E. Ernst, Harris B. Winsberg, Troutman Sanders, LLP, Atlanta, GA, Counsel for Debtors.

William H. Sudell, Jr., Robert J. Dehney, Derek C. Abbott, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE, Ronald R. Peterson, Catherine Steege, Jenner & Block, Chicago, IL, Counsel for the Official Committee of Unsecured Creditors.

David L. Buchbinder, Robert J. Schneider, Richard L. Schepacarter, Wilmington, DE, Office of the United States Trustee.

### OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Motion of the United States Trustee ("UST") to compel Charter Behavioral Health Systems, LLC, and its affiliates ("the Debtors") to file amended monthly operating reports ("MORs") to reflect disbursements on a Debtor by Debtor basis rather than a consolidated basis and to pay alleged delin-

quent quarterly fees. The Debtors have filed a Motion to allow the entry of a final decree in the last case which is open.

### I. BACKGROUND

On February 16, 2000, Charter Behavioral Health Systems, LLC ("Charter") and 101 of its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Additional cases were filed by other affiliates of Charter on April 4 and June 6, 2000. (Charter and its 108 affiliates are collectively referred to as "the Debtors.")

On February 17 and August 6, 2000, Orders were entered allowing the Debtors' cases to be jointly administered. In addition, on February 17, 2000, an Order was entered granting the Debtors' Motion for authority to continue the cash management system that they had used pre-petition. (Exhibit D–4.) Under that system, funds were deposited to the lockboxes of each of the operating Debtors[2] which were swept to a concentration account in the name of Charter. Charter then paid the operating expenses of the other Debtors.

Upon filing, Charter asked, and was authorized by the UST, to file one consolidated MOR. On May 15, 2000, the first MOR was filed and a quarterly fee paid by Charter for the maximum amount due ($10,000). Shortly thereafter, the UST contacted the Debtors and advised that quarterly fees were due by all Debtors. Apparently, the Debtors advised the UST that only Charter had disbursements and, consequently, that the other Debtors would pay only the minimum quarterly fee due. A letter confirming the conversation was sent by the

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to contested matters by Rule 9014.

2. Many of the Debtors had ceased operating pre-petition.

financial advisor for the Debtors to the UST together with a check for the other Debtors' first quarterly fee. Thereafter, the Debtors continued to file a consolidated MOR and to pay the maximum fee for Charter and the minimum fee for all other Debtors.

From the first day of their cases, the Debtors announced their intention to sell their operating assets and liquidate. On May 25, 2000, a Motion was filed to sell the Debtors' core facilities. That sale was consummated by September 2000. On August 11, 2000, the Debtors filed a motion for permission to abandon and destroy records relating to closed facilities. The UST objected to that motion and sought additional time and opportunity for patients to retrieve their medical records from the Debtors before they were destroyed. Orders were entered on October 5 and December 17, 2000, permitting the destruction of certain of the Debtors' records. A second motion to abandon and destroy records was filed on March 29, 2001, to which the UST did not object. It was granted by Order dated May 24, 2001. The Debtors did, however, retain certain records, including documents relating to preferences, accounts receivable, tax returns, MORs, medical records and Medicare/Medicaid cost settlement reports. In addition, the Debtors downloaded their general ledgers from the computer system onto discs.

The Debtors subsequently filed their liquidating plan on May 21, 2002. The UST filed an objection to confirmation asserting that the Debtors owed an additional $404,750 in quarterly fees.[3] The plan was confirmed on September 17, 2002, with the issue of the quarterly fees reserved for later determination. The Debtors deposited $400,000 in a segregated fund for quarterly fees in the event the UST's position was sustained. The UST was to file a motion for such a determination by December 31, 2002.

Instead, on November 21, 2002, the Debtors filed a Motion seeking a final decree closing their cases. The UST opposed that Motion stating that the additional quarterly fees must be paid first. By agreement, all cases except Charter's were closed without prejudice to the quarterly fee issue. The UST subsequently filed its Motion to compel the Debtors to pay the additional quarterly fees and to amend their MORs to reflect the disbursements on a Debtor by Debtor basis. The Motions were briefed and testimony was heard at a hearing held on March 27, 2003.[4] Since the main briefs have adequately addressed the legal issue, we declined to consider oral argument or additional briefing.[5]

## II. *JURISDICTION*

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 & 157(b)(1)(A), (B), and (O).

---

**3.** The UST now estimates the delinquent UST fees total $488,750. (Exhibit T–10.) The Debtors have paid $427,422 in UST fees to date. (Exhibit D–17.)

**4.** The parties have agreed that, upon issuance of our ruling, the Charter case can be closed retroactive to the hearing on this issue to avoid additional fees which may be caused by any delay in our ruling.

**5.** We also refused to consider the Debtors' reply brief that had been filed on March 20, 2003, without permission because it relied on the bench decision by Judge Wizmur in the *Genesis Health Ventures, Inc.,* case and the unpublished decision by Judge Farnan affirming that decision. We have consistently refused to consider bench rulings (even ones we make ourselves in other cases) because they often do not have the benefit of reflection and many times do not articulate all of the reasons behind the decision. Therefore, we do not consider bench decisions precedential and they should not be cited to us.

**40**

## III. DISCUSSION

### A. Equitable Estoppel

 The Debtors argue that, even if they were required to file MORs which detail the disbursements by Debtor and pay additional quarterly fees, they cannot now be compelled to do so because of the doctrine of equitable estoppel. "Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Equitable estoppel generally requires that a party "establish that they relied to their detriment on their adversary's misrepresentation and that such reliance was reasonable because they neither knew nor should have known the adversary's conduct was misleading." *Fredericks v. Comm'r*, 126 F.3d 433, 438 (3d Cir.1997). To assert equitable estoppel against the government, however, one must also establish "affirmative misconduct" by the government. *Id.* When determining whether a sufficient degree of affirmative misconduct has been demonstrated to support an estoppel claim against the government, courts should recognize that while "[n]ot every form of official misinformation will be considered sufficient to estop the government . . . . [y]et some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement." *Id.* (citations omitted).

The Debtors assert that the facts of this case fit the extreme case where the government must be estopped from changing its position and now asserting that additional UST fees are due from the Debtors. The UST disagrees, arguing that the facts of this case do not fit the "rare and extreme circumstances" which courts have required to estop the government. *See United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir.1992). Because this issue is largely dependent on the facts, we address them in detail.

#### 1. Alleged Misrepresentations

The Debtors assert that they discussed with the analyst from the UST, at their initial meeting, their intent to file a consolidated MOR and the analyst agreed. However, there were few details provided by the Debtors about that discussion and there is no writing confirming any agreement made at that time by the UST to the Debtors' method of calculating the UST fees. *See, e.g., Heckler*, 467 U.S. at 65, 104 S.Ct. 2218 (estoppel against the government cannot be based solely on oral rather than written misrepresentations).

The Debtors bolster their position that the UST agreed with their calculation method by reference to the discussions they had at the section 341 meeting of creditors. The tape of that meeting, as well as a transcript, was admitted into evidence. (Exhibit D-27.) From our review of the transcript, however, we conclude that the "advice" given by the UST was simply the standard recitation of the requirements for filing MORs. In fact, the UST attorney advised the Debtors that in large chapter 11 cases the examination by the UST was only perfunctory since the UST assumed that the creditors' committee would do a thorough job of examining the Debtors' financial affairs. (*Id.* at p. 40.) Further, on the topic of the preparation of the MORs and payment of the quarterly fees, the discussion was only general: the UST attorney advised the Debtors that he would insist on being paid, with no exception, and the Debtors asked only about the timing of the filing and payment of the first quarterly fees. (*Id.* at p. 48.) There was absolutely no discussion of the method of calculation of quarterly fees or whether Charter could claim all

disbursements as its own simply because they went through its checking account. Thus, we cannot conclude that the UST made any misrepresentations to the Debtors at the section 341 meeting of creditors on the issue before us.

Further, the Debtors admit that, when they filed the initial quarterly report and paid one fee for the consolidated cases, the UST protested and advised the Debtors that the other Debtors were also required to pay quarterly fees. The Debtors' advisor testified, however, that the UST agreed that the other Debtors owed only the minimum quarterly fee of $250 each. This agreement, the Debtors assert, was confirmed in a letter dated June 8, 2000, from the Debtors to the UST when the additional fees were paid. (Exhibit D–14.) A similar letter was sent each quarter thereafter with the UST fees calculated in the same manner. However, the letter does not support the Debtors' argument that the UST made any misrepresentations to the Debtors. Rather, that letter contains the representation by the Debtors that only Charter had disbursements.[6]

■ The Debtors assert that the UST made other written misrepresentations to them, including the quarterly statements sent by the UST to the Debtors which reflected that $10,000 was due from Charter, while only $250 was due from the other Debtors. (Exhibit D–6.) We disagree. The quarterly statements sent by the UST are not a misrepresentation by it of the amount of fees due by the Debtors, but merely a calculation based on the disbursements self-reported by the Debtors

on the MORs. Further, the UST statements state on their face that the quarterly fees are estimates only and the instructions attached make it clear that if the disbursements as reported by the Debtors are incomplete or inaccurate, the fee statements may also be inaccurate.

■ The Debtors also assert that the UST's failure to object to the centralized cash management Motion precludes the UST from now asserting that the other Debtors made any disbursements. We disagree. The cash management Motion did not ask the Court to rule that the operating Debtors would have no liability for UST quarterly fees if Charter wrote the checks for their expenses. It simply allowed the Debtors to continue to use their existing bank accounts without the necessity to close all pre-petition accounts and open new post-petition accounts. Such a motion may be entered on the first day of a chapter 11 case because it is procedural only; it does not substantively consolidate the assets of the respective debtors involved. We typically enter such an order only if the debtors can represent on the record that they are able to track each debtor's respective receipts and disbursements notwithstanding the use of a centralized cash management system. It is not clear whether such a representation was made in this case.[7]

Based on the facts presented, we conclude that the UST did not make any misrepresentation to the Debtors.

### 2. *Reasonable Reliance*

■ Even if the UST had told the Debtors that their calculation of the quarterly

---

6. The letter states that "The maximum trustee fee for the 1st Quarter of $10,000 was paid by the Parent Company, Charter Behavioral Health Systems, LLC. It is our understanding that the other 100 Charter entities are also required to pay a trustee fee. Since *these entities do not disburse funds*, we have en-

closed the minimum trustee fee ($250) for each entity." Exhibit D–14 (emphasis added).

7. This case was originally assigned to the former Honorable Roderick McKelvie of the District Court.

fees was accurate, the Debtors could not reasonably rely upon it. *See, e.g., Bachner v. Commissioner*, 81 F.3d 1274, 1282 (3d Cir.1996) (IRS's written statement that taxpayer owed no more taxes could not be raised as an equitable estoppel defense because it was at most negligence or a mistake of fact); *Monongahela Valley Hosp., Inc. v. Sullivan*, 945 F.2d 576, 588 (3d Cir.1991) (hospital could not reasonably rely on government's statement about treatment of interest earned).

■ Further, as we concluded above, the actions of the UST were not misrepresentations to the Debtors; at most, they were a failure to correct the Debtors' representations to the UST. This cannot work an estoppel against the government. *See, e.g., In re Pars Leasing, Inc.*, 217 B.R. 218, 220 (Bankr.W.D.Tex.1997). In *Pars Leasing*, the debtor argued that the UST had agreed to the debtor's calculation of the quarterly fees. However, the debtor had failed to disclose all the facts to the UST, namely, that a third party was paying the debtor's expenses directly. *Id.* The Court concluded that estoppel was not appropriate in those circumstances. *Id.* We agree with that analysis. Where a debtor has misrepresented facts to the UST, any statement by the UST of the amount of fees due cannot be reasonably relied upon by that debtor.

The Debtors argue nonetheless that they reasonably relied on the alleged agreement of the UST to their manner of calculating the fees due. The UST asserts, however, that not only did it not agree to that calculation but it advised the Debtors of the error in their preparation of the MORs and payment of quarterly fees and requested that they correct that error. The UST attorney assigned to the case testified that in January, 2001, she and the analyst assigned to the case discussed the failure of the Debtors to attach

to their MORs disbursement information for each Debtor. On February 6, 2001, she and the analyst orally requested that counsel for the Debtors and their financial advisors correct the MORs and recalculate the quarterly fees. However, she admits that she did nothing further to assure this was done, but assumed that the UST analyst did. She admits that no Motion was filed seeking to compel the Debtors to correct the MORs and pay additional fees until the instant Motion was filed two years later.

Even if we do not accept the testimony of the UST, however, we cannot conclude that the Debtors reasonably relied on the UST's failure to object to their MORs and the calculation of fees based on them. It was the Debtors, not the UST, who represented the critical fact in this case: that only Charter had disbursements. The UST merely accepted that representation and calculated the quarterly fees according to the formula in section 1930(a)(6). It was not reasonable of the Debtors to assume that that calculation was an acceptance of the Debtors' representation or that any investigation of that fact had been conducted by the UST. As testified by the UST attorney, and stated on the UST quarterly statement, the fees are calculated by the UST based on the Debtors' self-reported disbursements. The UST quarterly statement is not a representation of the UST that the Debtors' MORs are accurate. Thus, it was unreasonable for the Debtors to rely on that statement as a confirmation of the Debtors' representation on their MORs that only Charter had disbursements in that quarter.

### 3. *Detriment*

The Debtors argue that their reliance was detrimental to them because they are now unable, even at enormous cost, to comply with the UST's request to refile

their MORs and recalculate the quarterly fees. That is now impossible because the Debtors have destroyed their business records and terminated the employees needed to calculate the fees.

We disagree. The Debtors' witness acknowledged that the Debtors retained a copy of their general ledgers on discs downloaded from their computers. Despite the use of the centralized management system approved by the Court, the Debtors did maintain general ledgers for each operating Debtor.[8] In fact, the Court's record contains most of the information needed to do what the UST asks. Attached to each of the MORs filed by the Debtors was a list of checks written during the relevant month. (Exhibits D–2 & T–11.)[9] That list identifies for each check the general ledger number of the Debtor for whom the check was written. Thus, it can readily be ascertained from the MORs themselves whose expense was paid by each check. Although the Debtors' witness testified that only 20% of the checks are so identified, our review of the MORs reveals that this is not accurate. Instead, all of the checks have a general ledger number next to them. The work papers attached to the Debtors' tax return identify most of the Debtors by general ledger number. (Exhibit T–2.) We are not convinced that the Debtors cannot identify whose expenses those are or allocate them

among the Debtors if they represent expenses of more than one.[10] Thus, we cannot conclude that the Debtors detrimentally relied on any position taken by the UST with respect to their destruction Motions.

### 4. *Affirmative Misconduct*

The Debtors argue that the actions of the UST in this case constitute affirmative misconduct. They argue that the UST's failure to act to correct what the UST now asserts was an erroneous calculation of the fees is particularly egregious because it was in violation of the Manual policy that the UST "should keep informed of quarterly fee delinquencies and attempt to obtain fee payment at every opportunity" including specifically when fee applications are considered by the Court. (*Id.* at § 3–8.4.4.) Despite believing that the Debtors underpaid fees by over $400,000, the UST allowed interim fee applications to be approved and paid without asserting that UST fees were owed. Further, the Debtors assert that the UST violated the terms of its own Manual which requires that the UST "should specifically spell out the method of calculating and paying the United States Trustee's quarterly fees." (Exhibit D–1 at § 3–3.2.1.) The Debtors assert that the UST never told them that they were to calculate the UST quarterly fees

---

**8.** According to the testimony of the UST regional analyst, Ms. Logan, the Debtors' tax returns and MORs reveal that the Debtors maintained general ledger information on a Debtor by Debtor basis at least as to the operating Debtors. (Tr. at 19.)

**9.** Although the Debtors' exhibit (Exhibit D–2) purported to be the MORs filed by the Debtors for the entire case, that exhibit did not have the attachments, including specifically the list of checks. The UST exhibit (Exhibit T–11) contained 10 of the 95 pages of the list for the first MOR. We have reviewed the complete MORs filed by the Debtors in this

case, with their attachments, for the period from May to September, 2000, when the Debtors ceased operating.

**10.** For example, with respect to the May MOR, only 7% of the checks listed identify the expenses as Charter's. Further, approximately 12% of the checks in the May MOR have general ledger numbers that the tax return work papers do not relate to any Debtor. Some of the general ledger numbers appear to be expenses for more than one Debtor, such as 910 which is identified as "Insurance Division CBHS LLC."

based on a determination of whose expenses were paid by Charter.

■ We do not accept the Debtors' assertion that the UST committed any affirmative misconduct in this case. Mere negligence or inattention to duty is insufficient to work an estoppel against the government. *See, e.g., Bachner,* 81 F.3d at 1282 (negligence or a mistake of fact will not create an estoppel against the government). Further, as noted, we do not find any misrepresentation by the UST in this case but at most a failure of the UST to discover and correct a representation of the Debtors. This also is insufficient to create an estoppel against the government. *See, e.g., Pars Leasing,* 217 B.R. at 220.

In comparison, in the *Fredericks* case where the Third Circuit did accept the estoppel defense, it found additional reasons for the taxpayer to have relied on the government's misrepresentations. In that case, the IRS not only advised the taxpayer that he had not signed an unlimited waiver of the statute of limitations but eight years later sought to rely on the unlimited waiver to collect taxes, interest and penalties that had accrued in the interim. 126 F.3d at 442.

The facts of this case are not analogous to the *Fredericks* case. There was no affirmative misrepresentation by the UST in this case. Nor did the UST hide any fact from the Debtors in this case or seek to use the hidden fact against the Debtors after an extended period had elapsed. The UST is not seeking to collect interest or penalties from these Debtors notwithstanding the fact that, if the UST is correct, the Debtors should have paid over

$400,000 in additional fees in the Summer of 2000. There is simply no basis to conclude that the UST is equitably estopped from seeking to collect additional fees in this case.[11]

### B. *Section 1930(a)(6)*

■ The payment of quarterly fees to the UST is mandated by section 1930(a)(6) of title 28. The issue presented is the proper calculation of that fee in the case of jointly administered Debtors who use a centralized cash management system by which one of the Debtors pays all the expenses of the other Debtors. The statute provides that a debtor shall pay fees "in each case under chapter 11 of title 11" calculated on a sliding scale based on "disbursements" made in that quarter. 28 U.S.C. § 1930(a)(6). The statute sets a minimum fee of $250 and a maximum fee of $10,000 per quarter.

The parties dispute the meaning of the word "disbursements" in the statute. The Debtors argue that it means who writes the check, while the UST argues that it means the payment of an expense of the Debtor, regardless of who writes the check. The UST argues its interpretation is consistent with the requirement that quarterly fees be paid "in each case." The Debtors respond that their interpretation is consistent with that because if a debtor writes no check in a quarter it still pays a minimum fee under the statute.

■ The plain meaning of a statute is conclusive except in the rare cases when the literal application of a statute produces a result "demonstrably at odds with its intentions of the drafters." *United States*

---

11. The Debtors also argue that the UST Motion must be denied because, contrary to the Confirmation Order, the Motion was not filed by December 31, 2002. The UST asserts that its objection to the Debtors' Motion to close the case, which was filed on December 5, 2002, was sufficient to meet the requirements of the Confirmation Order. The Debtors have not pressed this argument, but have asked instead for a ruling on the merits of the fee calculation issue.

*v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citation omitted). The Supreme Court has reiterated this strict constructionist approach. *Hartford Underwriters Ins. Co. v. Union Planters Bank,* 530 U.S. 1, 7, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (the Court began its analysis "with the understanding that Congress 'says in a statute what it means and means in a statute what it says there' ") (*quoting Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)).

In interpreting the meaning of disbursements in section 1930(a)(6), the Eleventh Circuit examined the definition of disbursement in nine dictionaries and concluded that "The general consensus is that a 'disbursement' is defined as either (a) the action or fact of disbursing, or (b) that which has been disbursed, money or funds paid out, or expenditure. To 'disburse' means (a) to pay out or expend money; (b) to pay or defray costs, expenses, or charges; (c) to distribute; or (d) to pay for or on account of some thing." *In re Cash Cow Services of Fla., LLC,* 296 F.3d 1261, 1263 (11th Cir.2002), *cert. denied,* ── U.S. ──, 123 S.Ct. 979, 154 L.Ed.2d 896 (2003). We agree that the plain language of the statute supports the UST argument that the word disbursement includes, as to the individual Debtors, the payment of their operating expenses.

■ Section 1930(a)(6) has been interpreted in two lines of analogous cases and the majority have ruled that "disbursements" include *all* payments made by or for a debtor, regardless of the source of payment. In cases considering what dis-

bursements must be included in determining quarterly fees post-confirmation,[12] the Courts have held that all disbursements, not simply those to creditors under the plan of reorganization, must be included in the calculation. *See, e.g., In re Danny's Markets, Inc.,* 266 F.3d 523, 526 (6th Cir. 2001) (all post-confirmation disbursements, including operating expenses, must be included in calculation of UST fees); *In re Jamko, Inc.,* 240 F.3d 1312, 1316 (11th Cir.2001) ("there is ample support ... to conclude that Congress intended the UST fee to apply to all disbursements made during the entire process ... before or after confirmation, as a type of user tax on those who benefit the most from the program"); *In re Celebrity Home Entertainment, Inc.,* 210 F.3d 995, 998 (9th Cir.2000) (conclusion that post-confirmation disbursements are included in section 1930(a)(6) is supported by legislative history); *In re Maruko,* 219 B.R. 567, 572 (S.D.Cal.1998) (same); *In re Postconfirmation Fees,* 224 B.R. 793, 797–99 (E.D.Wash.1998); *In re Boulders on the River, Inc.,* 218 B.R. 528, 541 (D.Or.1997).

In another line of cases, Courts have overwhelmingly concluded that all disbursements made by or on behalf of a debtor by third parties should be included in determining the amount of fees due under section 1930(a)(6). *See, e.g., St. Angelo v. Victoria Farms, Inc.,* 38 F.3d 1525, 1534 (9th Cir.1994), *modified,* 46 F.3d 969 (9th Cir.1995) (payments to secured creditors from proceeds of sale of their collateral were disbursements under section 1930(a)(6)); *In re Hays Builders, Inc.,* 144 B.R. 778, 780 (W.D.Tenn.1992) ("The ordinary, plain meaning of the statutory lan-

---

**12.** Section 1930(a)(6) was amended in 1996 to provide that UST fees must be paid after confirmation until the case is converted, dismissed, or closed. Many debtors had argued that only disbursements made pursuant to the confirmed plan had to be included, not the

post-confirmation reorganized debtors' ordinary business expenses because the latter are not expenses of the "estate" or "debtor". This argument has been rejected by the Courts who have considered it.

guage requires that all disbursements, whether direct or through a third party, be included in the calculation of fees due the trustee under § 1930(a)(6)"); *In re Central Copters, Inc.,* 226 B.R. 447, 449 (Bankr. D.Mont.1998) (payment of sale proceeds from sale of debtor's property directly to secured creditor was a disbursement under § 1930(a)(6)); *Pars Leasing,* 217 B.R. at 220 (disbursements is broadly interpreted to include all disbursements made by third parties on behalf of and for the benefit of the debtor); *In re Flatbush Associates,* 198 B.R. 75, 78 (Bankr.S.D.N.Y.1996) (disbursements included rent paid by debtor's subtenants directly to debtor's landlord).

In *Flatbush,* the Court noted that the rents due from the debtor's subtenants were property of the estate and that, by paying them directly to the debtor's landlord, the subtenants were paying an expense of the debtor's. 198 B.R. at 78. Similarly, in this case, the revenues collected from the operating entities through the lockboxes and swept to the Charter concentration account were at all times property of the operating entities. We conclude that the use of the cash receipts of the operating Debtors to pay their operating expenses is a disbursement of the operating Debtors under section 1930(a)(6).

The Court in *Pars Leasing* agreed that: The statute does not limit disbursements to those made directly by the debtor. It was intended, in the opinion of this Court, to be broadly applied and virtually all courts have so applied it. To adopt the narrow view that the debtors urge would open the system up to undue manipulation. For example, just prior to entering the domain of Chapter 11, a debtor could create with its major contracting parties a procedure whereby those major contracting parties would pay a significant portion if not all of the expenses attendant to their particular

contract with the debtor, remitting only net monies and thereby frustrating the intent of the statute.

217 B.R. at 220.

The Debtors ask us to distinguish all of the above cases because they dealt with different facts. We do not find these distinctions to be relevant. We find it particularly hard to distinguish this case from the cases where a third party pays the expenses of a debtor. In this case, there has been no substantive consolidation of the Debtors. Each Debtor is a separate legal entity and is a debtor in possession in a separate chapter 11 case. Therefore, Charter is, in fact, a third party vis-á-vis the other Debtors and the payment by Charter of the other Debtors' expenses is exactly analogous to the facts in the above cases. The only difference is that Charter is an affiliate of the other Debtors, which, if anything, makes the UST's argument more compelling. The payment of the expenses of the other Debtors by a related third party is *more* subject to abuse than the payment by an unrelated third party.

The Debtors argue nonetheless that the rulings in the above cases were based principally on a concern that a debtor could manipulate the system and avoid the payment of UST fees by arranging for a third party to make payments on the debtor's behalf. Because their cash management system was in place long before the bankruptcy case was filed, the Debtors assert that it was not created to avoid UST fees. However, that is irrelevant; the fact is that the Debtors are avoiding the payment of UST fees, whether it was intended or not. Further, in the *Pars Leasing* case, the arrangement for the third party to pay the debtor's expenses had been made pre-petition and there was no suggestion that the intent of the agreement was the avoidance of UST fees. *Id.* at 218. Nonetheless, the Court concluded

that the expenses paid by the third party were disbursements of the debtor for purposes of calculating the quarterly fees. Thus, the Debtors' attempt to distinguish the myriad cases which interpret section 1930(a)(6) is to no avail.

Without citing any cases in support, the Debtors argue nonetheless that "disbursements" must mean "checks written" because "disbursement" is a concept that is used in the cash method of accounting which the parties concede is the method on which the UST fee system is based. The UST's argument that "disbursements" means "expenses" is flawed, the Debtors argue, because "expense" is a concept used in the accrual method of accounting not the cash method.

The UST did argue in the GC Companies case that "disbursements" is equivalent to the accounting definition of expenses. See, e.g., In re GC Companies, Inc., 274 B.R. 663 (Bankr.Del.2002). The UST provided a similar analysis of the quarterly fees due here as in GC Companies. The UST's analysis started with the work papers for Charter's tax returns. (Exhibit T–2.) Those work papers contained financial statements for each of the operating Debtors which set forth the amount of their revenues and expenses for the tax year. After adjusting those figures to reflect the 2002 calendar year, the UST backed out non-cash expenses (depreciation, amortization and bad debt) and calculated the net expenses of each Debtor.

We agree with the Debtors that this analysis is flawed. The Debtors' financial advisor testified that the Debtors' tax returns and financial statements are prepared on an accrual basis. There are significant differences between accrual and cash accounting, such as when revenues and expenses are booked. In accrual accounting, for example, an expense may not be "booked" on the financial statements or tax returns in the same year it is paid. Consequently, the information from which the UST calculated the UST quarterly fees due by the Debtors is not a reliable barometer of what the Debtors' cash disbursements were in 2002.

However, we do not agree with the Debtors' argument that because the term "expense" is a term used in accrual accounting, it cannot be the definition of "disbursements" in section 1930(a)(6). In non-accounting jargon, an expense is a disbursement. Cash Cow, 296 F.3d at 1263. Therefore, we conclude that section 1930(a)(6) requires a determination of whose expense is being paid by the disbursement of cash, regardless of who actually writes the check or when it is posted on the Debtors' accounting records. The issue here is not who wrote the check or when the disbursement was booked but whose disbursement was made.[13]

The parties acknowledge that there is only one published opinion which has addressed the exact issue before us. See, e.g., In re GC Companies, Inc., 274 B.R. 663 (Bankr.Del.2002). In the GC Companies decision, Judge Katz rejected the debtors' argument that "disbursements" means checks written because it "would allow for easy manipulation of cash payments in order to evade the provisions of § 1930(a)(6)." Id. at 674. However, he also rejected the UST's argument that "disbursements" means "expense" because he felt that to "find disbursements to be an expense, using the appropriate accounting

---

13. The UST is not seeking to obtain a double recovery of its fees by asserting that Charter owes fees for all the checks it wrote, while the other Debtors owe fees for any check written by Charter that paid their expenses. Instead, the UST is seeking to collect a fee only once for each expense, from the Debtor whose expense it actually is.

definition or principle, would create a bookkeeping nightmare. A room full of ten accountants may very well provide ten different opinions on allocation methods. The calculation of fees would result in a battle of accounting experts." *Id.* Instead, Judge Katz held that "disbursements" mean a payment on the "legal obligation of the debtor." *Id.*

The Debtors and the UST both believe that this analysis is flawed. We agree. Instead, we conclude that the proper interpretation of the term "disbursements" is whose expense is being paid. In most instances, it will be the entity who is legally obligated on the debt. But in some instances it may be necessary to determine who benefitted by the expense. For example, if debtor X is the tenant under a lease, both the legal obligation and the expense for the rent due under that lease would be X's. Where, however, one debtor is listed as the tenant under a lease and another debtor is the one actually using the facility, it is the latter whose expense it is and the latter who should be charged with the UST fee for the payment of that expense.

The Debtors argue that a determination of whose expense is being paid on every check would be a monstrous task, particularly in this case where they are being asked to do it after the fact, not before. We are not persuaded by that argument, however, because, as noted above, the Debtors do in fact have the wherewithal to calculate the fee easily. The Debtors maintained general ledgers for each of the operating Debtors which identify whose expense was being paid by each check written.[14] This is reflected on the attach-

ments to the MORs filed by the Debtors in this case. Every check has a general ledger number identifying which Debtor's expense it paid. Although some general ledger numbers are not identified in the work papers accompanying the Debtors' tax returns (Exhibit T–2), the Debtors' financial advisor testified that the Debtors retained numerous financial records, including the Debtors' general ledgers, financial statements and tax returns. Therefore, we conclude that the Debtors should be able to provide the UST with a list of the general ledger numbers for all Debtors. Further, the Debtors should be able to do the addition necessary to calculate the total disbursements made under each general ledger number for the period when the Debtors were operating. Therefore, we do not accept the Debtors' assertion that the fees cannot be properly or easily calculated by using the proper method, namely, whose disbursement was being paid.

## IV. CONCLUSION

For the foregoing reasons, we grant the Motion of the UST and direct the Debtors to file amended MORs detailing the disbursements made for each Debtor and to pay the corresponding quarterly UST fees for each Debtor.

An appropriate Order is attached.

### ORDER

AND NOW, this **8TH** day of **APRIL, 2003,** upon consideration of the Motion of the United States Trustee to Compel Debtors to (i) File Amended Monthly Op-

14. While leaving the determination of whose expense is being paid to the Debtor is subject to abuse, the business judgment by which related companies generally book expenses is a reliable basis on which to determine the UST fees. The burden of properly reporting disbursements is on a debtor. *See* Fed. R. Bankr.P.2015. Thus, in the first instance, the Debtors should be required to identify whose expense is being paid. Where abuse is shown, of course, the Court can make the ultimate determination of whose expense is, in fact, being paid.

erating Reports and/or Report Disbursement Information, and (ii) Pay Delinquent Quarterly Fees and the Response of the Debtors thereto, it is hereby

**ORDERED** that the Motion is **GRANTED;** and it is further

**ORDERED** that the Debtors shall file modified monthly operating reports identifying for each Debtor those disbursements made on its behalf and paying the appropriate quarterly UST fees pursuant to 28 U.S.C. § 1930(a)(6).